**UNITED STATES of America,
Appellee,**

v.

**Thomas McKEEVER and Lawrence Morrison, Appellants.**

**No. 327, Docket 25492.**

United States Court of Appeals
Second Circuit.

Argued June 2, 1959.

Decided Nov. 10, 1959.

See also 169 F.Supp. 426.

**670**

Henry A. Lowenberg, New York City, for appellants.

Otis Pratt Pearsall, Asst. U. S. Atty., Southern Dist. of New York, New York City (S. Hazard Gillespie, Jr., U. S. Atty., and George I. Gordon, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before CLARK, Chief Judge, and LUMBARD and WATERMAN, Circuit Judges.

LUMBARD, Circuit Judge.

Thomas McKeever and Lawrence M. Morrison appeal from sentences of five years imprisonment, with five additional years on probation, following their convictions for conspiracy and extortion in violation of the Anti-Racketeering Act, 18 U.S.C.A. § 1951. The indictment charged a conspiracy to obstruct the movement of goods in interstate and foreign commerce by means of extortion, together with forty-two counts of extortion, on all of which both defendants were convicted.

The appellants raise three questions on this appeal: first, whether the grand jury testimony of certain government witnesses should have been turned over to the defendants; second, whether certain F.B.I. reports of interviews with government witnesses should have been made available pursuant to 18 U.S.C. § 3500; and third, whether the trial judge should have permitted the jury to hear a tape recording of a conversation between a principal government witness, Jack Ball, and the defendant McKeever, which recording was offered during Ball's cross-examination, first to refresh his recollection, and later to impeach him.

We find error in the trial judge's refusal to make available certain portions of the grand jury testimony of the government witnesses Thomas McGinn and Jack Ball and as that error was substantial we reverse the convictions. We also find error in the failure of the trial court to conduct *voir dire* examination of government agents preliminary to determining whether some of their reports of conversations with government witnesses should have been made available to the defense pursuant to 18 U.S.C. § 3500.

We briefly summarize the evidence, all of which was adduced by the government, as the defense called no witnesses.

In June of 1955 James J. Ball & Sons, Inc., an export packing company at 32 Moore Street, New York City, entered into a contract with Local 205 of the Independent Longshoremen's Association with respect to their warehouse workers

and coopers. The company's steamship pier workers were already organized in I. L. A. Local 1171. Under the new contract the wages of the Local 205 employees were approximately doubled and the union on its part agreed that it would make every effort to organize employees of Ball company's competitors. The union representatives in these negotiations were the defendants McKeever and Morrison.

In June 1955 the Ball company's quotation on a large job for the Marion Shipping Co. was accepted and it became important to make sure through McKeever and Morrison that the men would be available for the job and that the pay rates for the Local 205 employees, which were still lower than the 1171 wages, would apply with respect to work to be done by the Local 205 men on the piers, rather than the higher 1171 rates. Jack Ball and Fred Ford, president of James J. Ball & Sons, Inc., had several discussions with McKeever and Morrison about the pay rates, but McKeever and Morrison were adamant in insisting that the higher 1171 rates would have to be paid to all employees working on the piers.

At a lunch conference at the Meurat Club, Jack Ball said to the two union men "Leave us alone and get off our back and go out and organize some of our competitors instead of bothering us." Either McKeever or Morrison replied "That takes money."

A few days after the Meurat Club meeting, Jack Ball talked to McKeever and Morrison in front of 32 Moore Street. They wanted to know why no money was there for them and Ball asked what was expected. According to Ball's testimony at the trial, McKeever, and Morrison then requested $300 a week. When Ball indicated that the demand was impossible and would put the company out of business, McKeever and Morrison finally agreed to accept $100 a week. Ball testified that he agreed to this because of fear of a work stoppage. Ford in his testimony also stated that this fear was the reason for the payments. In ad-

dition, George Ball, Jack's brother, testified that Jack spoke to him at about this time and said that he would have to pay off the union because he was afraid.

Following the agreement to pay $100, McKeever and Morrison, or one of them, came to the company office each Friday and were given $100 in cash. On the first Friday, which was September 9, 1955, no receipt of any kind was given, but after Ball requested some receipt, McKeever and Morrison furnished freight bills each week, all of approximately $100. The exhibits included three such bills from the P. M. Transfer Co. and three bills from the Roberts Motor Freight Co. According to the testimony of the 205 shop steward, McGinn, he and Morrison removed the remaining freight bills from the company files some time in the fall of 1956. At no time did P. M. Transfer Co. or Roberts Motor Freight Co. perform any trucking services for the Ball company. John Masiello, who operated the P. M. Transfer Co., testified that McKeever, who was a friend of his, secured some trucking receipt blanks from him on a pretext.

Altogether there were forty-two payments of $100; Jack Ball himself made ten or fifteen such payments and he testified that three such payments were made by Ford. McGinn testified that on six to nine occasions he delivered the money. Still other payments were made by William Weilberg, the bookkeeper until February 1956, and thereafter by Meyer Wisotski, who succeeded him. On two occasions Wisotski gave the money to a messenger after McKeever had telephoned him that some one would pick it up.

After his arrest by the F.B.I., Morrison stated that he had never received any payment from the company or anyone connected with it, other than payments for union dues or initiation fees, and he specifically denied receiving $100 weekly during the period in question. Despite Morrison's statement, as the trial progressed, the defense strategy centered not upon denying the payments but upon establishing that they were made volun-

tarily to finance the union's efforts to organize competitors rather than out of fear of a work stoppage, as the government claimed. Indeed, in their summations, both defense counsel as much as conceded that the $100 weekly payments had been made and argued that they had been made for the purpose of organizing the company's competitors.

### The Grand Jury Testimony of Thomas McGinn and Jack Ball

■■ During the cross-examination of each government witness the defense asked for the production of the grand jury testimony of that witness. Upon each occasion the trial judge thereupon read the grand jury testimony of the witness [1] and except for most of the testimony of Irving Altman he declined each request. We have therefore examined the grand jury testimony of Jack Ball, Thomas McGinn, Meyer Wisotski, Fred Ford and Irving Altman. We conclude that the trial judge was in error in not making available certain portions of the testimony of Jack Ball and Thomas McGinn.[2]

The propriety of disclosing any testimony given before the grand jury rests upon Rule 6(e) of the Federal Rules of Criminal Procedure, 18 U.S.C. and derives from the time-honored and well-established principle that whatever happens before the grand jury should be kept secret unless and until the court is of the opinion that there is no longer a good reason for secrecy. United States

v. Procter & Gamble Co., 1958, 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077. In this Circuit the procedure whereby grand jury testimony may be made available to the defense is well established. After a government witness has testified on direct examination, if there appears to be some basis for supposing that his grand jury testimony may be at variance with his trial testimony, the defense may ask the trial judge to examine the witness' grand jury testimony. If the trial judge finds any material discrepancy between the trial testimony and the grand jury testimony, such part of the minutes is made available to the defendant. United States v. Spangelet, 2 Cir., 1958, 258 F.2d 338.

Jack Ball was the only witness who testified to the talk at which McKeever and Morrison demanded money and finally agreed to accept $100 a week. It was Ball's testimony at trial that the defendants had first asked for $300 a week and that after he remonstrated with them and told them that this was crazy they finally agreed to $100. Before the grand jury Ball was asked these questions and gave these answers:

"Q. * * * where did the amount come from, the amount of $100 a week? A. I really don't recall how we came to the agreement of $100 a week. I don't recall.

* * * * * *

"Q. Do you recall who decided on the amount of $100 a week? A.

---

1. We think the trial judge's examination of the minutes, without requiring a showing of possible inconsistency, was the proper and desirable course. See United States v. Zborowski, 2 Cir., 1959, 271 F. 2d 661; Jencks v. United States, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, and Pittsburgh Plate Glass Co. v. United States, 1959, 360 U.S. 395, 401, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (dissenting opinion).

2. We think it unnecessary to pass upon the trial judge's exclusion of the balance of the grand jury testimony of Jack Ball and McGinn and that of the other wit-

nesses. As such questions may arise in a somewhat different context at a new trial no purpose would be served in doing so now. However, it is appropriate to point out that the government should be prepared to advise the trial judge regarding possible discrepancies between trial and grand jury testimony. See United States v. Spangelet, 2 Cir., 1958, 258 F.2d 338, 342. Indeed we feel that it is the duty of the prosecutor to consent to make such testimony available where there is a reasonable basis for believing that the testimony differs on matters which are not immaterial. See United States v. Zborowski, 2 Cir., 1959, 271 F.2d 661.

It was either McKeever or Morrison, one of the two of them.

"Q. Did they tell you directly that 'We want $100 a week'? I want your best recollection on this. Can you recall what was said about the amount of money? Let me rephrase it: Did you decide that $100 a week should be paid? A. No. They brought it up, but I don't know how they phrased it.

\* \* \* \* \* \*

"Q. Did anyone say to you directly—do you recall—'Pay us $100 a week'? A. It was $100 a week. I don't know if it was said in those words.

\* \* \* \* \* \*

"Q. When they came around together, did they ask for $100 a week or did they mention the one hundred dollar sum, or what did they say, if you can recall? A. They mentioned the $100. I forget if they wanted more or what.

\* \* \* \* \* \*

"Q. Did they mention a sum? A. They mentioned $100. I forget if they wanted more, and I just said that was too much."

In determining whether or not they would believe Jack Ball's story, in whole or in part, it was material for the jury to know that during his grand jury testimony, given some ten months prior to his trial testimony, he had been unable to remember whether any amount other than $100 had been mentioned.

Surely it was important for the jury to know whether McKeever and Morrison had first demanded $300 or whether they had merely talked about $100. If they had only asked for $100, it might well be argued that that was more consistent with a proper solicitation for money to be used in organizing the company's competitors.

We also believe that certain portions of McGinn's grand jury testimony should have been made available to the defense because that testimony may have had an important bearing on the jury's estimate of McGinn's credibility. At trial McGinn testified that he knew the envelopes which he gave McKeever and Morrison contained $100 because it was the bookkeeper's practice to count out the money and place it in the envelope in his presence. Before the grand jury he had testified in effect that he knew that there was $100 in the envelopes because he opened them. Had McGinn's trial testimony been concerned solely with the fact of the $100 weekly payments, we would not think that the failure to disclose this discrepancy was of sufficient importance to require reversal in view of the fact that the defense virtually conceded the payments had been made. But McGinn also testified at trial that he and Morrison, at Morrison's suggestion, went to the Ball company's office one evening after all the employees had left and extracted some of the freight bills from the files. Of course this evidence would tend to show consciousness of guilt on the part of Morrison and, in view of the conflicting claims which the jury had to resolve, McGinn's testimony at trial about rifling the files may have carried great weight with the jury.

Therefore we conclude that the discrepancy in McGinn's grand jury testimony about his knowledge of the contents of the envelopes might have had an important bearing on the jury's appraisal of his credibility with respect to matters other than the weekly delivery of the $100. It was error for the trial judge to refuse to disclose to the defendants this portion of McGinn's grand jury testimony.

### The F.B.I. Reports

Many of the government witnesses were interviewed by the F.B.I. on numerous occasions and defense counsel called for the production of the F.B.I. reports relating to these conversations, citing the Jencks decision, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, and 18 U.S.C. § 3500.

Whether such F.B.I. reports should be made available to the defense after a witness has testified on direct examination is a far different question from whether

the grand jury minutes of that witness should be made available.

Following the Supreme Court decision in Jencks, supra, the Congress enacted 18 U.S.C. § 3500. This statute defines the right of the defense to inspect a "statement" of a prosecution witness made to an agent of the government if the "statement" in the government's possession is, *inter alia*, "a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500 (e) (2).

From the legislative history of § 3500 it is clear that the Congress had two purposes in mind. In the words of Senator O'Mahoney, 103 Cong.Rec. 16487 (1957), "The purpose of the bill is to protect the files of the Government against unwarranted disclosure and at the same time to preserve due process of law for defendants in criminal cases." Due process is afforded defendants under the Jencks statute by the provision that there should be available for cross-examination of government witnesses any documents which contain recitals substantially in the words of the witness.

With respect to reports, it is immaterial whether or not the report of what the witness has told the agent is at variance with his trial testimony. If the report meets the tests of § 3500 such parts of it as relate to the case on trial must be delivered to the defendant.

■ During the trial the court examined all of the F.B.I. reports *in camera*, and on the basis of this examination alone the court ruled that certain signed statements of McGinn and Ford be made available and that none of the other reports met the statutory requirements, apparently concluding that the reports were not "substantially verbatim." While in many cases such an inspection would be sufficient to indicate with reasonable certainty that the statute's terms had or had not been met, we think that as to some exhibits [3] further information was required to assist the court in its determination. See Palermo v. United States, 1959, 360 U.S. 343, 355, 79 S.Ct. 1217, 3 L.Ed.2d 1287. None of the reports in question is entirely a verbatim recital of a witness' oral statements. Each, however, appears to set out the substance of the interviewee's remarks, occasionally in quotation marks, and seems not to contain the comments or ideas of the interviewer. Additionally, it is clear that a number of the reports were not transcribed until several weeks after the interviews to which they relate took place, though in some instances notes were contemporaneously made. In short, it is not clear whether these reports are or are not within the statute's requirements. Under these circumstances it was not enough merely to read the documents in question. The proper course would have been for the trial court to conduct *voir dire* examination to obtain further evidence bearing on the issues raised by the statutory requirements. See Papworth v. United States, 5 Cir., 1958, 256 F.2d 125, 129, certiorari denied, 1958, 358 U.S. 854, 79 S.Ct. 85, 3 L.Ed.2d 88, affirming D.C.N.D.Tex.1957, 156 F.Supp. 842, 853; United States v. West, D.C.N.D.Ohio 1959, 170 F.Supp. 200, 210. The exclusion of these reports without *voir dire* examination was error.

■ Among the factors which the trial court should consider as bearing upon the question whether a report is "substantially verbatim" are the extent to which it conforms to the language of the witness, see United States v. Stromberg, 2 Cir., 1959, 268 F.2d 256, 273; United States v. Waldman, D.C.D.N.J. 1959, 159 F.Supp. 747, 749, the length of the report in comparison to the length of the interview, see Palermo v. United States, supra, 360 U.S. at page 355, note 12, 79 S.Ct. at page 1226, and the lapse of

---

3. Exhibits 23, 24 and 25 regarding Jack Ball, 30 regarding Wisotski and 40 and 41 regarding Altman.

time between the interview and its transcription, see id., 360 U.S. at pages 352–353, 79 S.Ct. at pages 1224–1225. Where notes have been made, it would be pertinent to inquire into the lapse of time between the interview and the note-making, and between the note-making and the report in question. Additional factors will no doubt suggest themselves in each case.

In every case, however, the statute must be interpreted with a mind to the fact that only a substantially verbatim, not a precisely verbatim, recital of the witness' pre-trial oral statement is required; and the recording made of this statement—of which the document sought may be either the original or a "transcription"—need be only contemporaneously, not simultaneously made. Moreover, the statutory language should not be construed so narrowly as to lose sight of the congressional purposes—to exclude the subjective impressions and opinions of the person making the report and to prevent the use of "statements to impeach a witness which could not fairly be said to be the witness' own," Palermo v. United States, supra, 360 U.S. at page 350, 79 S.Ct. at page 1223.

### The Tape Recording

A further and separate contention of the defendants, that the court should have permitted the jury to hear a recording of a conversation in August 1958 between McKeever and Jack Ball, should be considered, since the question seems likely to arise again on retrial. During the cross-examination of Jack Ball defense counsel sought to play in open court a tape recording of this conversation for the stated purpose of refreshing the witness' memory of the conversation. The trial judge, after listening to the recording three times and trying to get agreement among counsel as to what was said on it,[4] ruled that the recording could not be played within the hearing of the jury, but permitted Ball to listen to the recording on earphones within view of the jury. Subsequently, the court declined to permit the playing of the tape before the jury for the purpose of impeaching Ball, though he allowed defense counsel to read to the witness and to the jury from a stenographic transcript of the recording many statements of the witness conflicting with his testimony on direct examination.

We find no error in the court's rulings with respect to the tape. Documents shown to a witness for the purpose of reviving his recollection may not be read or shown to the jury, since the documents themselves are not evidence and have no independent evidentiary value. Portman v. American Home Products Corp., 2 Cir., 1953, 201 F.2d 847, 850; Wigmore, Evidence § 763 (3d Ed. 1940). That such material is sought to be introduced on cross rather than direct examination is not a difference of significance. See Young v. United States, 1954, 94 U.S.App.D.C. 62, 214 F.2d 232, 237–238; cf. Wigmore, Evidence § 764 (3d Ed. 1940). Nor should the fact that a tape recording rather than a written document was involved affect the result, since a recording played over earphones to the witness bears a close analogy to a document shown only to the witness.

---

4. The tape recording was made by McKeever on a Minifon recorder secreted under his coat. *Voir dire* testimony of McKeever (who did not take the stand at the trial) and of other witnesses established the authenticity of the recording to the satisfaction of the trial judge. Playback of the recording took 43 minutes but only the last 16 minutes can be understood with reasonable clarity and apparently only this last part constituted the Ball and McKeever conversation about the indictment and the charges then pending against the appellants. In our opinion the last 16 minutes are sufficiently clear to be heard and understood. Of course in our discussion we do not reach the further point whether a sufficient foundation had been laid before the jury as to the authenticity and accuracy of the recording. It would seem that Ball's admissions alone would not be enough. McKeever did not testify at the trial and none of the *voir dire* testimony was before the jury.

In our opinion the trial judge was also well advised to deny the defendants the right to play the recording when offered for impeachment purposes. The only relevant portions of the recording were what Ball said to McKeever. The recording, however, contained so many self-serving statements by the defendant McKeever that it is doubtful whether any instruction by the trial judge that the jury should not consider McKeever's taped statements as bearing on the truth or falsity of his defense would have been adequate to prevent such consideration. To have permitted the playing of the recording involved in this case would in effect have allowed a witness to give testimony without being sworn and without opportunity for his cross-examination. When, as here, the unsworn witness was the defendant himself, who at no time during the trial took the stand and whom the government was powerless to call as a hostile witness, we think it was a proper exercise of the trial judge's discretion to forbid the playing of the recording.

Moreover, in this case the jury had before it the very words that Ball uttered. From the stenographic transcript of the recording defense counsel read numerous quotations of Jack Ball, inquiring as to whether he had said such words. As a result the jury had Jack Ball's admissions that he had spoken as quoted and his explanation of why he had so spoken to McKeever, including several admissions that his statements to McKeever in the recorded conversation were lies.

The novelty about this tape recording is the' fact that it was made after the indictment. The conversation was not a part of any alleged criminal acts or any conspiracy for which a participant was being tried; it was relevant only because it was a different version of what a witness, Jack Ball, said at trial. While there are many reported cases involving the use of recordings as evidence, we have found none which poses the questions here presented. From its very nature only a part of the recording was relevant and that part could not be played separately from what was said by McKeever.

We commend the patience and diligence of the trial judge in solving the problems raised by this proffered proof so that in the end the jury had before it all it was entitled to hear bearing on Ball's credibility and the rights of the defendants and the government were equally protected.

Reversed and remanded for a new trial.