**UNITED STATES of America, Appellee,**

v.

**David S. KING, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Stanley E. DEAL, M. D., Appellant.**

**Nos. 77–2611, 77–2612.**

United States Court of Appeals, Ninth Circuit.

July 31, 1978.

Rehearing and Rehearing En Banc Denied Dec. 14, 1978.

nor (argued), Las Vegas, Nev., for appellant.

Helena S. Maclay, Asst. U. S. Atty. (argued), Billings, Mont., for appellee.

Before ELY and CHOY, Circuit Judges, and HALL,* District Judge.

ELY, Circuit Judge:

In a jury trial appellants King and Deal were convicted of conspiracy to possess cocaine with intent to distribute it. 21 U.S.C. § 846 (1976). The indictment charged seven persons. Three defendants, including one Shaw, pleaded guilty. Charges against another defendant were dismissed. The jury acquitted a remaining defendant named Bresnahan but convicted King and Deal.

King and Deal were sentenced to ten-year terms in custody and five-year special parole terms. On appeal King challenges the admission into evidence of various tape recordings.

Deal presents five arguments which concern the sufficiency of the indictment, the sufficiency of the evidence, the failure of the trial court to give instructions about immunized witnesses, the propriety of a government agent's pretrial interview of a witness, and the admissibility of character evidence of Deal's gullability and compassion. Concluding that the first two issues should be resolved in Deal's favor, we do not address the other three.

## FACTS

Dr. Deal is a licensed physician who, apparently, is registered with the Drug Enforcement Agency (DEA) to prescribe drugs for controlled substances.[1] In springtime of 1976, Deal learned that his wife's son, Jack Young, was imprisoned in Mexico on drug charges. Deal testified at trial that his wife, Mary Ann Deal, continually pressured him to try to obtain Young's release from prison.

R. Allen Beck (argued), of Moses, Tolliver & Wright, Billings, Mont., W. Randell Mai-

* Honorable Peirson M. Hall, Senior District Judge, Central District of California, sitting by designation.

1. See p. 965 *infra*.

In September 1976, King, Shaw, and other persons began dealing in narcotics transactions with DEA agents Fredericks and Lasher, who represented themselves as members of a large West Coast organization engaged in narcotics trafficking. Fredericks told Shaw that he wanted to establish major cocaine connections. Shaw, who was heavily in debt at the time, hoped to support his own cocaine usage by completing a large cocaine transaction. Shaw was informed of Young's imprisonment from Bresnahan, a close friend of Young's and an acquaintance of Deal's. Shaw inferred that Young, if he were freed, might provide the large cocaine sources desired by Fredericks.

Bresnahan told Deal that Shaw, Fredericks, and Lasher might be able to help Young. Deal did not know Shaw, and at Shaw's request, Bresnahan arranged for Shaw to meet Deal at a Las Vegas airport on January 15, 1977. Shaw testified that Deal gave him a small sample of cocaine at that meeting. Deal denied that such a transaction had occurred. Shortly thereafter, however, Shaw gave Fredericks and Lasher .42 grams of cocaine, telling them that it came from Deal and that Deal was willing to supply large amounts of cocaine of a similar quality.

On January 17, Deal, Shaw, Fredericks, and Lasher met in Las Vegas. Fredericks and Lasher expected to buy a pound of cocaine from Deal. According to Deal, he in turn realized that Fredericks and Lasher anticipated that he would sell cocaine but hoped to stall and persuade them to secure Young's release before they received any cocaine. Deal explained that he thought that Young, were he freed, might decide to supply Fredericks and Lasher with cocaine. At any rate, no sale resulted from the meetings, and Deal's contacts with Shaw, Fredericks, and Lasher terminated.

Around January 20, a cocktail waitress tipped off Shaw that law enforcement officers had knowledge of his proposed cocaine transaction. Shaw and his associates were unable to discover the nature of the surveillance, but they suspected Fredericks and Lasher. Although negotiations continued, no narcotics transactions were consummated.

At trial the prosecution introduced eight tape recordings of telephone conversations between Fredericks and King made between January 20, 1977 and March 28, 1977, and containing conversations concerning proposed narcotics transactions. Also at issue is an unrecorded telephone call that King claims Lasher made to him on January 20. King alleges that during the call Lasher, representing himself as an "enforcer" for the West Coast narcotics organization, threatened him unless he helped the organization obtain cocaine connections. Lasher denies ever having made such a telephone call. King claims that in all of the subsequent recorded telephone conversations he had with Fredericks, later introduced into evidence against him, he only appeared to go along with Fredericks' efforts to arrange narcotics transactions because he was afraid that he would be in danger if he did not. Thus, King alleges that the incriminating statements he made during the recorded conversations with Fredericks were not voluntary but were a subterfuge to escape a confrontation with the agents, whom he believed were members of a powerful and ruthless narcotics operation.

## UNITED STATES v. KING

When King moved to suppress introduction of the recorded conversations, the District Court conducted a hearing to determine whether the recorded conversations were admissible. After receiving the testimony of several witnesses, including King, Lasher, and Fredericks, the District Court found that King's assertions were not credible and ruled that the statements made during the recorded conversations were voluntarily made and admissible. King now challenges the trial court's failure to suppress introduction of the recorded conversations, raising four issues. None of King's arguments persuades us that the judgment of conviction, as to him, should be reversed.

## I

King first claims that the foundation for the admission of the recordings was fatally flawed because it did not include a showing that the statements he made in the recorded conversations were voluntarily made, without any kind of inducement. In making this argument, King relies upon the foundation requirements set forth in *United States v. McKeever*, 169 F.Supp. 426 (S.D. N.Y.1958), *rev'd on other grounds*, 271 F.2d 669 (2d Cir. 1959). The *McKeever* court listed the required elements of a proper foundation for the admission of sound recording as including showings:

(1) That the recording device was capable of taking the conversation now offered in evidence.

(2) That the operator of the device was competent to operate the device.

(3) That the recording is authentic and correct.

(4) That changes, additions or deletions have not been made in the recording.

(5) That the recording has been preserved in a manner that is shown to the court.

(6) That the speakers are identified.

(7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

169 F.Supp. at 430.

These foundation requirements have been recently adopted by the Eighth Circuit in the context of electronic monitoring. *See United States v. McMillian*, 508 F.2d 101, 104 (8th Cir. 1974), *cert. denied*, 421 U.S. 916, 95 S.Ct. 1577, 43 L.Ed.2d 782 (1975). While we are fully aware that the introduction of sound recordings into evidence at criminal prosecutions presents evident dangers which courts must recognize, we are reluctant to impose rigid foundation requirements which purport to cover the varied and particularized circumstances of different cases. The Fifth Circuit's recent decision in *United States v. Biggins*, 551 F.2d 64 (5th Cir. 1977), is instructive. There, the court was likewise faced with a claim by an appellant that the introduction of sound recordings by the Government was improper because an adequate foundation had not been laid. In addressing the issue, the court carefully analyzed the function of foundation requirements in the context of a criminal trial. It noted the *McKeever* foundation elements and stated:

Although we neither adopt nor reject that test as a whole, we think that certain of its requirements may justifiably be imposed on the party seeking to introduce sound recording evidence. The court properly admits a sound recording into evidence only when the party introducing it carries its burden of going forward with foundation evidence demonstrating that the recording as played is an accurate reproduction of relevant sounds previously audited by a witness. As a general rule, at least in the context of a criminal trial, this requires the prosecution to go forward with respect to the competency of the operator, the fidelity of the recording equipment, the absence of material deletions, additions, or alterations in the relevant portions of the recording, and the identification of the relevant speakers.

This burden properly falls to the government because it has access to such information in a way the criminal defendant does not. A defendant will often hear the tape recording for the first time in court. More so than photographs or other demonstrative evidence, sound recordings are susceptible to alterations that may be impossible to detect. It is therefore important that the defendant be alerted regarding any possible uncertainties or distortions in the recording before it is introduced as evidence against him.

Nevertheless, the trial judge has broad discretion in determining whether to allow a recording to be played before the jury. The standards for foundation evidence we adopt serve the paramount purpose of ensuring the accuracy of the recording. Strict compliance with the government's particularized burden is the preferred method of proceeding. If the trial judge independently determines that

the recording accurately reproduces the auditory evidence, however, his discretion to admit the evidence is not to be sacrificed to a formalistic adherence to the standard we establish. If there is independent evidence of the accuracy of the tape recordings admitted at trial, we shall be extremely reluctant to disturb the trial court's decision even though at the time that decision was made the government had not carried its particularized burden of going forward.

*Id.* at 66–67 (footnotes omitted).

█ Noticeably, the court in *Biggins* omitted the voluntariness requirement in restating the *McKeever* formulation. Moreover, it found that formalistic adherence to a rigid set of foundation requirements was neither required nor advisable. Although our Court has apparently never passed directly on the desirability of the *McKeever* formulation of the elements needed to construct a proper foundation for the admission of sound recordings, our cases similarly indicate that authenticity and general trustworthiness are the keystones of a proper foundation. In *Brandow v. United States,* 268 F.2d 559 (9th Cir. 1959), we stated that "[t]he foundation which must be laid for the introduction of recordings of conversations—its nature and extent—differs widely. It is a matter largely within the good discretion, judicially exercised, of the trial judge." *Id.* at 567. *Accord, Stubbs v. United States,* 428 F.2d 885 (9th Cir. 1970), *cert. denied,* 400 U.S. 1009, 91 S.Ct. 567, 27 L.Ed.2d 621 (1971); *Todisco v. United States,* 298 F.2d 208 (9th Cir. 1961), *cert. denied,* 368 U.S. 989, 82 S.Ct. 602, 7 L.Ed.2d 527 (1962). Accordingly, we think that the *McKeever* elements, upon which King relies, are useful, but not dispositive, guidelines for determining when a proper foundation for the introduction of sound recordings has been made. Ultimately, the trial court, in the exercise of its judicial discretion, must be satisfied that the recording is accurate, authentic, and generally trustworthy. The burden is properly on the offering party—here the Government—"to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of . . . recordings . . . ." *United States v. Knohl,* 379 F.2d 427, 440 (2d Cir.), *cert. denied,* 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). *Accord, United States v. Starks,* 515 F.2d 112, 121 (3d Cir. 1975).

█ Whether statements made by the defendant in a recorded conversation were voluntarily made is, of course, an issue bearing on the general trustworthiness and probative value of a sound recording. The trial court held a suppression hearing specifically to examine King's claims that his statements reflected in the recordings were not voluntary. At this hearing King testified that he received a threatening, unrecorded telephone call from Agent Lasher on January 20, 1977, before any of the recorded conversations with Agent Fredericks took place. Lasher testified that he made no such call and denied ever making any threats. After receiving testimony from other witnesses, the trial judge ruled that the conversations were voluntary and were not motivated by King's alleged fear of Lasher. Although King vigorously attempts to relitigate this factual issue on appeal, we are satisfied that the trial court's determination was supported by substantial evidence. Moreover, we note that the trial judge was in a position to evaluate the credibility of the various witnesses, a prime determinant in matters such as this. Considering the record as a whole, we are convinced that the trial judge plainly acted within his discretion in admitting the recorded conversations.

## II

█ King's next argument is no more than a variation of his first. He argues that his incriminating statements, made in the recorded conversations, were coerced and involuntary, and, thus were inadmissible. This contention is based upon the general rule that involuntary confessions and admissions are inadmissible. As we have noted, the trial court held a suppression hearing on the issue of voluntariness and rejected King's argument. We are obliged

to accept the trial court's determination unless it is clearly erroneous. *United States v. Curtis*, 562 F.2d 1153, 1154 (9th Cir. 1977); *United States v. Cluchette*, 465 F.2d 749, 754 (9th Cir. 1972). Having concluded that the trial judge's determination was supported by substantial evidence, we reject King's argument.[2]

### III

■ King's third contention is that the warrantless recording of his conversations with Agent Fredericks was a violation of the Fourth Amendment. This contention has been repeatedly rejected. A sound recording made by a government agent who is a party to the recorded conversation or a sound recording made by a government agent with the permission of one of the parties to the recorded conversation is not a violation of the Fourth Amendment. *United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971); *United States v. Testa*, 548 F.2d 847, 855 (9th Cir. 1977); *United States v. Ryan*, 548 F.2d 782, 787 (9th Cir. 1976), *cert. denied*, 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977). *See* 18 U.S.C. § 2511(2)(c) (1976).

King would have us draw a distinction here, however, based on the fact that Fredericks initiated all of the recorded conversations by calling King on the telephone. We fail to see how this purported distinction has any relevance to the Fourth Amendment. The fact that Fredericks initiated the conversations might have some bearing on the issue of voluntariness. Yet, this issue, we have noted, has already been properly resolved against King. If there is some overtone of entrapment, King has failed to make the claim explicit either here or at trial. Accordingly, his argument here is rejected.

### IV

■ King's last argument is that the recordings should not have been admitted because all of the conversations occurred after the termination of the conspiracy and thus were not relevant to the establishment of the conspiracy. King argues that the conspiracy, if any, ended on or before January 20, 1978, when Shaw was tipped off that law enforcement officers had knowledge of his proposed narcotics transactions. Our review of the evidence compels us to conclude otherwise. Negotiations between Fredericks and King concerning proposed narcotics transactions continued well into March 1977 and were reflected in the recorded conversations. Although the proposed drug deals never materialized, perhaps because of the conspirators' aroused suspicions, the evidence was sufficient to show that they were still contemplated and being actively planned at the time the recordings were made. Moreover, even if the conspiracy had ended prior to the recorded conversations, evidence of subsequent acts may be admitted "to elucidate the nature of the prior conspiracy." *United States v. Testa*, 548 F.2d 847, 852 (9th Cir. 1977).

King's conviction must be affirmed.

### UNITED STATES v. DEAL

21 U.S.C. § 841(a)(1) (1976) defines the offense that was the object of the charged attempt and conspiracy, providing, in pertinent part:

> Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
>
> (1) to . . . distribute, or dispense, or possess with intent to . . . distribute, or dispense, a controlled substance . . . .

A medical exception to the statute, contained in 21 U.S.C. § 822(b) (1976), authorizes "practitioners" to dispense controlled substances. It reads:

> Persons registered by the Attorney General under this subchapter to . . . distribute . . . or dispense controlled substances are authorized to possess, . . . distribute, or dispense

2. We also note that King was permitted to present his argument on the voluntariness issue to the jury.

such substances . . . to the extent authorized by their registration and in conformity with the other provisions of this subchapter.

## I

At the pretrial stage, Deal moved to dismiss the indictment because of its failure to allege that Deal distributed cocaine without "a legitimate medical purpose . . . in the usual course of his professional practice." 21 C.F.R. § 1306.04(a) (1977). The indictment identified Deal as a physician, charging him as follows:

STANLEY E. DEAL, M.D. [and the other defendants] wilfully and knowingly did combine, conspire, confederate and agree together, with each other, and with diverse other persons whose names are to the Grand Jury unknown, to possess with intent to distribute cocaine, in violation of Section 846, Title 21, United States Code.

.   .   .   .   .

11. It was further part of said conspiracy that Stanley E. Deal, M.D., did, on or about the 15th day of January, 1977, at Las Vegas, Nevada, distribute to John S. Shaw an unknown quantity of cocaine, of which .42 grams were distributed to Michael E. Fredericks and Edmund C. R. Lasher, Jr.

.   .   .   .   .

All in violation of Section 846, of Title 21, United States Code.

The indictment, however, does not indicate whether Deal was a practitioner.[3]

Deal's argument, in essence, is that the indictment did not charge an essential element of the offense, i. e., lack of authorization to dispense cocaine. See Fed.R.Crim.P. 7(c). We agree. In *United States v. Black,*

512 F.2d 864 (9th Cir. 1975), our court held that lack of authorization to distribute or dispense controlled substances is an element of the crime. *Id.* at 868. The most liberal reading of the indictment does not reflect an allegation that Deal acted outside of the scope of the medical exception.

The failure of an indictment to detail each element of the charged offense generally constitutes a fatal defect. *See, e. g., Batchelor v. United States,* 156 U.S. 426, 15 S.Ct. 446, 39 L.Ed. 478 (1895); *United States v. Huff,* 512 F.2d 66 (5th Cir. 1975); *Nelson v. United States,* 406 F.2d 1136 (10th Cir. 1969); *United States v. Root,* 366 F.2d 377 (9th Cir.), *cert. denied,* 386 U.S. 912, 87 S.Ct. 861, 17 L.Ed.2d 784 (1966). It is of paramount importance to the rights of the accused that the indictment contain an adequate recitation of each component of the crime that the Government must establish. One test used to evaluate the sufficiency of an indictment is "whether the indictment 'contains the elements of the offense intended to be charged, "and sufficiently apprises the defendant of what he must be prepared to meet." ' " *Russell v. United States,* 369 U.S. 749, 763, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962), *quoted in United States v. Pheaster,* 544 F.2d 353, 360 (9th Cir. 1976). While courts should read indictments in a common sense manner, refusing to reverse a conviction because of minor deficiencies in the indictment that could not have prejudiced the defendant, the shortcoming in this case—a failure to charge every essential element of the crime—is by no means a mere technicality.[4]

Although a more lenient standard is sometimes used when scrutinizing indictments charging conspiracies, *see, e. g., Pheaster, supra,* we cannot properly apply such a standard when, as here, the flaw is

---

**3.** The term "practitioner" is defined as

a physician . . . licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he practices . . , to distribute [or] dispense . . . a controlled substance in the course of professional practice. . . .

21 U.S.C. § 802(20) (1976). Registration with the Attorney General is required for a physi-

cian to be eligible for the medical exception. *See* 21 C.F.R. § 1301.21 (1977) (annual registration).

**4.** For an example of a satisfactory indictment in a case charging a registered physician with unlawful distribution of a controlled substance, see *United States v. Boettjer,* 569 F.2d 1078, 1080–81 (9th Cir. 1978).

unrelated to the unique nature of conspiracy. The justification for a slightly relaxed standard is that before trial it is often difficult to describe fully, yet concisely, all the intricate facts supporting a charge of a conspiracy evidenced by numerous transactions involving a large number of participants. This rationale is absent when the defect is the failure to charge a necessary or essential element of the crime and does not stem from the factual complexities inherent in most conspiracy crimes.

## II

Wholly apart from the insufficiency of the indictment, there is another reason why Deal is entitled to reversal. Upon the facts of this case, the Government should have been required to prove the nonapplicability of the medical exception beyond a reasonable doubt. In a similar case, *United States v. Black, supra,* we analyzed at length the crime of unauthorized distribution of controlled substances. There the defendant, Black, had introduced no evidence concerning the medical exception, but the Government had proved

> a variety of facts bearing on the medical practitioner's exception, among them that Black was a medical practitioner, that he was duly registered with the Attorney General to dispense controlled substances, that the controlled substances were transferred pursuant to a writing purporting to be a prescription, and that the transfers were to patients at a clinic where Black was the attending physician.

512 F.2d at 870–71 (footnote omitted). We held that the Government's proof of the above facts fulfilled Black's burden of going forward with evidence of entitlement to the medical exception, which is imposed upon the accused by 21 U.S.C. § 885(a)(1) (1976).[5] Thus, the Government had to prove beyond a reasonable doubt the nonapplicability of the medical exception. Our Brother Koelsch, writing for the court, reasoned that the presumption of lack of authorization embodied in section 885(a)(1) violated due process as applied to medical practitioners, such as Black and Deal, because of its irrationality in that setting.

> It is not "more likely than not" that medical practitioners registered to dispense controlled substances do so illegitimately and are guilty of a criminal act; common experience, we think, dictates precisely the opposite conclusion. Given the irrationality of the presumption of non-exception as applied here, it may neither be used to conclude the issue of non-exception nor to transfer the burden of going forward to Black; and he may not be found guilty of violation of § 841(a)(1) unless the trier of fact determines beyond a reasonable doubt that Black's conduct was not within the medical exception authorized by the statute.

512 F.2d at 871.

■ The Government attempts to distinguish *Black* on the basis that there was no evidence that Deal used a prescription to transfer cocaine to a patient. Its effort, however, is unpersuasive. In *Black* we did not state that the facts adduced in that case constituted a threshold, *i. e.,* the minimum facts necessary to meet an accused's production burden and trigger the requirement that the Government prove nonexception beyond a reasonable doubt.[6] The rationale of *Black*—the registered medical practitioners who dispense controlled substances cannot be presumed to do so unlawfully—applies in a case, such as the present one, in which it is shown, without more, that the defendant is a physician duly registered with the Attorney General to dispense con-

---

5. 21 U.S.C. § 885(a)(1) (1976) provides:

    It shall not be necessary for the United States to negative any exemption or exception set forth in this subchapter in any complaint, information, indictment, or other pleading or in any trial, hearing, or other proceeding under this subchapter, and the burden of going forward with the evidence with respect to any such exemption or exception shall be upon the person claiming its benefit.

6. In fact, the court expressly stated that it would not decide if a showing of less facts or no facts at all bearing on the medical exception would justify use of the presumption of lack of authorization. 512 F.2d at 870 & n. 11.

trolled substances. The presumption is irrational, and hence unconstitutional, because we cannot say "with substantial assurance that the presumed fact [of nonauthorization] is more likely than not to flow from the proved fact [of distribution by a practitioner] on which it is made to depend." *Leary v. United States,* 395 U.S. 6, 36, 89 S.Ct. 1532, 1548, 23 L.Ed.2d 57 (1969).

■ As a second distinction of this case from *Black,* the Government points to circumstantial evidence of the nonapplicability of the medical exception. Although the testimony concerning Deal's and Shaw's meeting at the Las Vegas airport tends to show that Deal's alleged dispensation of cocaine was not "issued for a legitimate medical purpose," it is totally irrelevant to the question whether Deal has met his burden of production. Once a defendant introduces sufficient evidence to fulfill his burden of going forward, it is incumbent upon the prosecution to prove its case beyond a reasonable doubt. The prosecution cannot, as an alternative, offer some controverting evidence to shift an evidentiary burden back to the defendant.[7]

■ At trial Deal attempted to introduce into evidence his controlled substances registration, but the trial court excluded it, apparently believing that Deal's denial of having written any prescriptions for Shaw or the DEA agents made the registration irrelevant. The registration, however, was directly relevant, for it would have established Deal's status as a medical practitioner, thus shifting the burden of proof to the Government. Deal's denial of having written prescriptions for cocaine cannot relieve the Government of the necessity for proving every element of the crime beyond a reasonable doubt. It is clear that Deal was attempting to present alternative defenses: first, that he did not give cocaine to nor prescribe cocaine for Shaw; and second, that if he did give cocaine to Shaw, it was in the course of his professional practice. Alternative defenses, of course, are proper, even if inconsistent. *United States v. Demma,* 523 F.2d 981, 985 (9th Cir. 1975) (en banc). Therefore, the trial court's erroneous evidentiary ruling precluded Deal from satisfying his burden of production of evidence concerning his possible medical exception.

### III

Even were we to conclude that the defect in the indictment was not fatal and that the trial court's evidentiary ruling, which resulted in a misallocation of the burden of proof, was not reversible error because of the evidence in the record tending to suggest the nonapplicability of the medical exception,[8] reversal would still be necessary because of the jury instructions. The instructions failed to indicate that lack of authorization is an element of the crime or that the jury must find lack of authorization under the medical exception beyond a reasonable doubt before it could convict Deal. This court, both in *Black, supra,* 512 F.2d at 868, and in *United States v. Davis,* 564 F.2d 840, 845 (9th Cir. 1977), has defined lack of authorization to distribute or dispense controlled substances as an essential element of the offense.

■ Although Deal did not object to the instructions on this ground, the failure to charge a necessary element of the offense generally is plain error under Fed.R.

---

7. *United States v. Hooker,* 541 F.2d 300 (1st Cir. 1976), reinforces our conclusion that the Government retains the task of proving that a practitioner's dispensations of controlled substances were not for legitimate medical purposes, even though the record contains some evidence that the dispensations were unauthorized. The *Hooker* court applied *Black,* requiring that the Government prove beyond a reasonable doubt defendant practitioner's lack of authorization, but then ruled that the voluminous evidence of defendant's unprofessional conduct presented at trial was sufficient for the jury to find that defendant's distributions of narcotics were not medically exempt. *Id.* at 305.

8. We are not, however, expressing an opinion as to whether there was evidence in the record sufficient to sustain a jury finding that Deal's alleged distribution of cocaine was not for a legitimate medical purpose. In light of the instructions, it is manifest that no such finding was ever made.

Crim.P. 52(b) because it affects a defendant's substantial rights. *United States v. De Marco*, 488 F.2d 828, 832 (2d Cir. 1973); *United States v. Small*, 472 F.2d 818, 819 (3d Cir. 1972). The failure to instruct on every element of an offense is harmless error only if the omitted element is undisputed, and, therefore, its omission could not possibly have been prejudicial. *See Olar v. United States*, 391 F.2d 773, 775 (9th Cir. 1968). Deal's entitlement to the medical exception most certainly was a contested issue at trial, as evidenced particularly by Deal's objection to the indictment and his attempt to introduce his controlled substances registration.

Accordingly, the judgment of conviction as to King is affirmed. The judgment as to Deal is vacated, and the cause remanded for further proceedings consistent with this opinion.

SO ORDERED.

CHOY, Circuit Judge, concurring in part; dissenting in part:

I concur in that portion of the majority opinion affirming appellant King's conviction.

However, I respectfully dissent from that portion of the opinion vacating the judgment of conviction as to appellant Deal. The majority holds that:

1. The indictment was fatally defective in failing to charge that Deal lacked authorization to distribute or dispense cocaine, an essential element of the offense charged.

2. The district court erred in ruling that Deal did not meet his burden of production on the issue of the applicability of the medical exception, and in not placing the burden of proof of that issue on the Government.

3. The district court's failure to instruct the jury on the issue of lack of authorization constituted plain error.

### I. *Sufficiency of the Indictment*

I conclude that it was not necessary to charge lack of authorization in the indictment. As a medical exception under 21 U.S.C. § 822(b), lack of authorization was not required to be included in the indictment. 21 U.S.C. § 885(a)(1) states in part:

> *It shall not be necessary for the United States to negative any exemption or exception set forth in this subchapter in any* complaint, information, *indictment* or other pleading or in any trial, hearing, or other proceeding under this subchapter
> . . . .

(Emphasis added.)

Before the Government assumed the burden of proof on the medical exception carved out in § 822(b), it was imperative that Deal first introduce sufficient evidence to place the applicability of the medical exception in issue. Section 885(a)(1) further requires that "the burden of going forward with the evidence with respect to any such exemption or exception shall be upon the person claiming its benefit" (in this case, Deal).

Since the Government could not anticipate whether Deal would present sufficient evidence to claim the medical exception, the issue of lack of authorization could only become an element of the offense after the indictment, and only if Deal sustained the burden of production.

Even assuming lack of authorization is an essential element of the offense, the indictment must be read in common sense manner. *United States v. Anderson*, 532 F.2d 1218, 1222 (9th Cir.), *cert. denied*, 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1976). The fact that Deal was named in the indictment as an M.D. and charged with the criminal dispensement of cocaine "in violation of Section 846, Title 21, United States Code" surely implies that he did so for other than a medical purpose.

In my opinion the indictment was sufficient.

### II. *Burden of Production*

I would hold that Deal failed to meet the burden of production imposed on him by 21 U.S.C. § 885(a)(1).

Under *United States v. Black*, 512 F.2d 864, 869 (9th Cir. 1975), the presumption of lack of exception embodied in § 885(a)(1) is violative of due process only if its application would be irrational based on the facts proved. After an analysis of *Barnes v. United States*, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973), *Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), and *Tot v. United States*, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943), the court in *Black* concluded that

> once *sufficient facts* have been shown to render the statutory presumption of guilt *irrational* as applied to those particular facts, the presumption may not then be used to justify imposition of a further burden of production or to deprive the accused of a factual determination upon the disputed issue—the government must then prove its case.

*Id.* at 870 (emphasis added). Thus, § 885(a)(1)—although captioned "burden of proof"—was interpreted as defining only an initial burden of production, satisfaction of which placed upon the Government the burden of proving nonapplicability of the exception beyond a reasonable doubt. Accepting the above-quoted statement from *Black* as the criterion used in shifting the burden of proof, I conclude that Deal did not present sufficient facts "to render the statutory presumption of guilt irrational." The facts of *Black* are clearly distinguishable from those in the present case.

In *Black*, the Government's own evidence showed not only that the defendant "was a medical practitioner . . . duly registered with the Attorney General to dispense controlled substances," but also "that the controlled substances were transferred pursuant to a writing purporting to be a prescription, and that the transfers were to patients at a clinic where Black was the attending physician." *Id.* at 870–71. In *Deal*, no evidence was introduced to indicate that the dispensation of cocaine was pursuant to prescriptions, or that it was to Deal's patients. In fact, his own testimony at trial indicated the opposite.

Even if Deal had successfully introduced evidence establishing his status as a medical practitioner registered to distribute controlled substances, his professional status alone would not have been sufficient prima facie to rebut the presumption of nonapplicability of the medical exception imposed by § 885(a)(1).

As a Schedule II controlled substance under 21 C.F.R. § 1308.12(b)(4) (1977), cocaine may not be dispensed "without the written prescription of a practitioner, except that in emergency situations, as prescribed by the Secretary by regulation after consultation with the Attorney General, such drug may be dispensed upon oral prescription . . ." 21 U.S.C. § 829(a). Since Deal testified that he did not dispense the cocaine pursuant to prescriptions, then even assuming he had introduced his controlled substances registration, he failed to introduce sufficient evidence to establish a prima facie claim to the medical exception.

Thus, since "sufficient facts" were not shown to render the statutory presumption of lack of exception irrational, *Black*, 512 F.2d at 870, the burden of proof was not shifted to the Government on this issue.

### III. *Absence of Jury Instruction on Authorization*

Instructions to the jury on the issue of lack of authorization would have been warranted only if Deal had introduced sufficient evidence to rebut the presumption of nonapplicability to him of the medical exception. In Part II, *supra*, I have concluded that he did not.

The majority opinion indicates that the introduction of Deal's controlled substances registration would have been sufficient of itself to rebut the presumption of lack of exception; thus, the trial court's exclusion of this evidence was an abuse of discretion. Indeed, my Brothers Ely and Hall so hold despite the fact that no objection was made by Deal to this evidentiary ruling on appeal. However, it was well within the trial court's discretion to exclude the registration. The delivery of cocaine without a

prescription was not an authorized activity even for one who had a registration (*see* Part II, *supra*). Deal's own testimony established that his supplying of cocaine to Lasher, Fredericks, and Shaw was not pursuant to prescriptions. Therefore, the medical exception was unavailable, and the registration was irrelevant.

Even assuming that the trial court acted outside its discretion on this issue, Deal failed to introduce sufficient other evidence to rebut the statutory presumption of lack of exception.

Nonapplicability of the medical exception thus did not become an element of the offense to be proved by the Government. Accordingly, it was not plain error for the trial court to exclude jury instructions on this issue.

### IV. *Deal's Other Contentions*

Deal's other contentions, which the majority opinion does not reach, are in my opinion without merit. Since it would serve no useful purpose to discuss them here, I do not.

I would affirm Deal's conviction, as well as King's.