**STATE of Maine**

v.

**Linwood KNOWLES.**

Supreme Judicial Court of Maine.

Argued May 2, 1985.

Decided July 12, 1985.

---

John Alsop (orally), Asst. Dist. Atty., Skowhegan, for plaintiff.

Vafiades, Brountas & Kominsky, Jeffrey L. Hjelm (orally), Bangor, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, GLASSMAN and SCOLNIK, JJ.

VIOLETTE, Justice.

After a jury trial in the Superior Court, Somerset County, the defendant was convicted of operating a motor vehicle after his right to operate had been revoked because he was a habitual offender, 29 M.R.

S.A. § 2298 (Supp.1984), and operating a motor vehicle while under the influence of intoxicating liquor, 29 M.R.S.A. § 1312–B (Supp.1984). The sole issue on appeal is whether the trial court erred when it refused to instruct the jury on the competing harms defense, 17–A M.R.S.A. § 103 (1983). We determine that the court improperly denied the defendant's request for such an instruction. We therefore sustain the appeal.

On the afternoon of July 13, 1984, the defendant, Linwood Knowles, and several other people travelled to Skowhegan in a van owned by Knowles. They drove to the parking lot of the Midtown Hotel. Robert Harris operated the van on this trip to Skowhegan. Knowles's right to operate had been revoked because he was a habitual offender, 29 M.R.S.A. § 2292 (Supp. 1984).

After the group arrived at the Midtown parking lot, Knowles went alone to the hotel bar. According to Knowles, he expected to meet a friend, Crystal, later at the bar. With permission from the owner of the Midtown, Knowles recorded some music from the bar's jukebox with a tape machine that he had brought with him.

At some point, there was a confrontation between Knowles and another person at the bar, Walter Moody. Moody and several of his friends assaulted Knowles. Knowles left the hotel area and called the Skowhegan Police Department to report the beating. The dispatcher, Antonio Lemieux, told Knowles not to return to the hotel, and that an officer might assist him if he came to the police station. Knowles told Lemieux that he had to return to the Midtown bar to get his keys. According to Lemieux, Knowles sounded intoxicated.

Knowles then returned to the Midtown bar. He was again assaulted by Moody and his friends. After this beating, Knowles walked to the Skowhegan Police Department to seek assistance. He spoke with Sergeant Asselin. Both Sergeant Asselin and Antonio Lemieux observed Knowles to be very intoxicated at this time.

Sergeant Asselin warned Knowles not to start trouble at the Midtown and told him not to drive anywhere. The sergeant informed Knowles that he would be on patrol near the hotel bar in case there was any problem.

Knowles then went back to his van in the parking lot at the Midtown. There, he spoke with Dwayne and Dorothy Bennett, two people who had accompanied him on the trip to Skowhegan that afternoon, and who had returned to the van to wait for him. Knowles told them that he was going into the bar to find his friend Crystal and that they would then all leave the Midtown. Moody and his friends again assaulted Knowles and would not let him enter the bar. Dwayne Bennett went into the bar and retrieved Knowles's tape machine for him. At that point, Dwayne and Dorothy Bennett left the area on foot.

Knowles testified that Crystal then appeared in the parking lot near his van. At this point, Knowles stated, Moody and his friends were still assaulting him. According to Knowles, Crystal got inside the van. Knowles testified that he then got into the passenger seat of the van. Knowles stated that either Dwayne Bennett or Crystal had retrieved his keys from inside the bar. According to Knowles, he then told Crystal to drive to a nearby pay phone to call the State Police. Knowles testified that Crystal drove the van over to the pay phone. Upon seeing Moody and his friends approaching them, Knowles stated, he began to look for his shotgun in his van to defend himself and Crystal, who was attempting to use the pay phone. Knowles testified that he was in the driver's seat of the van when he saw a police cruiser arrive at the scene.

After Knowles had left the Skowhegan Police Station, Sergeant Asselin had driven to and parked at a point where he could observe the parking lot of the Midtown bar. The sergeant later observed Knowles's van proceeding through this parking lot. Sergeant Asselin then followed the van and pulled up next to it at a point where it had

stopped. Sergeant Asselin testified that the driver was the only person he observed in the van when he was following it, and that Knowles was seated behind the steering wheel when he pulled up next to the van. The sergeant further stated that, when he arrived, there was no female in the area who could have been Crystal. According to Sergeant Asselin, Knowles, who was still intoxicated, stated that he drove the van to save someone's life. The sergeant then placed Knowles under arrest.

Knowles maintained that he never operated the van. According to Knowles, Crystal disappeared shortly after the police cruiser arrived.

At the close of the evidence at trial, the defendant asked the presiding justice to instruct the jury on the defense of competing harms under 17-A M.R.S.A. § 103.[1] The justice determined, however, that, because the defendant testified that he did not operate the van, he was not entitled to an instruction that his operation of the van could be justified under the doctrine of competing harms. The defendant renewed his request before the jury retired to deliberate. The justice again refused to give the instruction.

■ A defendant is entitled to a jury instruction on a particular defense when he "can point to the existence of ... evidence sufficient to make the existence of all the facts constituting the defense a reasonable hypothesis for the factfinder to entertain." *State v. Glidden*, 487 A.2d 642, 644 (Me. 1985); *see State v. Reed*, 459 A.2d 178, 181 (Me.1983); *State v. Bahre*, 456 A.2d 860, 866 (Me.1983); *State v. Greenwald*, 454 A.2d 827, 830 (Me.1982). This is true whether it is the prosecution or the defendant or both who produce the relevant evidence. *Glidden*, 487 A.2d at 644; *State v. Kee*, 398 A.2d 384, 386 (Me.1979).

In the case at bar, the presiding justice did not even reach this question of whether the competing harms defense was generated by the evidence. Rather, the justice refused to give the instruction because he determined, as a matter of law, that a defendant who denies that he committed the crime cannot also assert the inconsistent defense that he did commit the crime because he "believe[d] it to be necessary to avoid imminent physical harm to himself or another," 17-A M.R.S.A. § 103(1).

■ "Generally, inconsistent defenses may be interposed in a criminal case." *State v. Harris*, 189 Conn. 268, 271, 455 A.2d 342, 344 (1983); *see United States v. King*, 587 F.2d 956, 965 (9th Cir.1978); *Johnson v. United States*, 426 F.2d 651, 656 (D.C.Cir.1970) (per curiam); *cf.* M.R. Crim.P. 11(a) ("A defendant may plead both not guilty and not guilty by reason of insanity to the same charge."). "The rule in favor of inconsistent defenses reflects the belief of modern criminal jurisprudence that a criminal defendant should be accorded every reasonable protection in defending himself against governmental prosecution." *United States v. Demma*, 523 F.2d 981, 985 (9th Cir.1975) (en banc). Reliance upon a particular defense by the defendant should not automatically relieve the prosecution of its burden to prove all the elements of the crime charged beyond a reasonable doubt. *See id.* at 986; *People v. Perez*, 62 Cal.2d 769, 776, 44 Cal.Rptr. 326, 329, 401 P.2d 934, 938 (1965); *Harris*, 189 Conn. at 271–276, 455 A.2d at 344–45; *State v. Branam*, 161 N.J.Super. 53, 59–62, 390 A.2d 1186, 1190–91, *aff'd* 79 N.J. 301, 399 A.2d 299 (1978). Similarly, the denial of the criminal act by the defendant should not relieve the prosecution of its burden to negate any defense generated by the evidence.[2] *See King*, 587 F.2d at 965 (defend-

---

1. Section 103(1), in pertinent part, provides:
 Conduct which the actor believes to be necessary to avoid imminent physical harm to himself or another is justifiable if the desirability and urgency of avoiding such harm outweigh, according to ordinary standards of reason-

ableness, the harm sought to be prevented by the statute defining the crime charged.

2. The State must disprove beyond a reasonable doubt the existence of any defense generated by the evidence. 17-A M.R.S.A. § 101(1) (1983); *see Glidden*, 487 A.2d at 644.

ant's denial of drug transfer could not relieve prosecution of burden of refuting evidence that alleged transfer, if made by defendant, was in the course of his professional practice).

The State, however, insists that "it is ... against logic and common sense" to allow a defendant to assert the competing harms defense after he denies that he committed the crime. For authority, the State relies exclusively upon decisions concerning whether a defendant who denies the underlying criminal conduct may also invoke the defense of entrapment.

■ Although many courts have refused to permit a defendant who denies the underlying criminal conduct to rely upon the entrapment defense as well, the decisions are "both literally and figuratively spread all over the map on this question." *United States v. Valencia*, 645 F.2d 1158, 1170 (2d Cir.1980).[3] We express no opinion ourselves regarding whether a defendant in Maine may rely upon the entrapment defense if he denies that he engaged in the criminal act. It is sufficient for us to say that there is nothing about the competing harms defense that would prompt us in this case to depart from the principle that a defendant may assert inconsistent defenses.

■ We note that the assertion of inconsistent defenses may be an unwise[4] and therefore unlikely tactical choice.[5] *See Demma*, 523 F.2d at 985. The prosecution is free to point out such an inconsistency in the defendant's case during trial and in argument. *State v. Hinds*, 485 A.2d 231, 238–39 (Me.1984). The defendant should have the option of presenting inconsistent

defenses to the fact finder, however, as long as there is evidence, from whatever source, that could rationally support those defenses.

■ We conclude that the trial court erred by refusing to instruct the jury on the competing harms defense because of its determination, as a matter of law, that the defendant could not assert inconsistent defenses. If the competing harms defense was generated by the evidence, from whatever source, the defendant was entitled to an instruction on it, regardless of the fact that he denied committing the underlying criminal acts.

The entry is:

Judgment vacated.

Remanded for proceedings consistent with the opinion herein.

All concurring.

---

3. Federal and state cases, respectively, dealing with this topic are collected at Annot., 54 A.L.R. Fed. 644 (1981), and Annot., 5 A.L.R.4th 1128 (1981).

4. In the context of the entrapment defense, one court has gone so far as to remark that "it is difficult to conceive of a competent attorney arguing to a court and jury that the defendant did not [commit the criminal act], but, if so, he was entrapped." *United States v. Liparota*, 735

F.2d 1044, 1048 (7th Cir.1984) (quoting *United States v. Kaiser*, 138 F.2d 219, 220 (7th Cir. 1943)), *rev'd on other grounds*, 471 U.S. ——, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985).

5. Illustrative is *State v. Boilard*, where the defendant made a "tactical decision not to argue ... justification [under 17–A M.R.S.A. § 104 (1983)], for fear of weakening the primary defense of denial of assaultive conduct." 488 A.2d 1380, 1390–91 (Me.1985).