809 A.2d 158 (2002)
355 N.J. Super. 21
STATE of New Jersey, Plaintiff-Respondent,
v.
Joseph ROMANO, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued October 7, 2002.
Decided November 12, 2002.
*159 Timothy P. Kane, Totowa, argued the cause for appellant.
Michelle Katich, Special Deputy Attorney General, argued the cause for respondent (James F. Avigliano, Passaic County Prosecutor, attorney; Ms. Katich, of counsel and on the brief).
Before Judges PETRELLA, BRAITHWAITE and PARKER.
The opinion of the court was delivered by BRAITHWAITE, J.A.D.
Defendant Joseph Romano was convicted in the Clifton Municipal Court of driving while intoxicated ("DWI"), N.J.S.A. 39:4-50. Following a trial de novo in the Law Division, he was again found guilty. An appropriate sentence was imposed, ultimately, and that issue is not raised on appeal.
The issues on appeal are whether the common-law defense of necessity entitled defendant to an acquittal and whether the Law Division judge committed reversible error by perceiving defendant's defense as duress, as opposed to necessity, and by shifting the burden of proof to defendant to prove the defense of duress by a preponderance of the evidence, rather than imposing the burden of proof on the State to disprove the defense beyond a reasonable doubt. We hold that defendant has established the common-law defense of necessity, and is entitled to a judgment of acquittal on the charge of DWI. We are also satisfied that the Law Division judge erred in shifting the burden of proof to defendant and comment on that issue for future cases.

I
Essentially, the underlying facts leading to defendant's DWI charge are not in dispute. The State conceded as much at oral argument. On December 1, 1999, at 2:18 a.m., Police Officer W. Stine was on routine patrol on Allwood Road in Clifton when he saw defendant's vehicle traveling "without its headlights on." Officer Stine followed and stopped the vehicle. Upon approaching the vehicle, Officer Stine saw defendant with "[h]is face ... covered in blood and ... bleeding profusely from [his] nose.... He was physically shaken... [and] frightened." Officer Stine summoned an ambulance. Defendant told Officer Stine that he was "scared" and that he was "jumped by some individuals" in the parking lot of Bucco's Restaurant ("Bucco's"), in Clifton." He also stated he was pleased to see Officer Stine and that "he needed help."
*160 On cross-examination, Officer Stine testified that he first observed defendant's vehicle when it was approximately 350 yards from Bucco's parking lot.[1] He testified that his attention was drawn to the vehicle because the headlights were off, and not because defendant was speeding or driving erratically. Officer Stine further testified that "[t]he observations [he] made appeared [that] [defendant] was frightened, he was scared, he possibly could be trying to get away from something," and that defendant was vague in identifying his assailants "for fear of making retaliation or some kind of revenge taken on him." The officer also confirmed that defendant was "full of blood" when he first saw him and that "[i]t was on his shirt, on his jeans, you know, it was all over his hands also." Officer Stine also testified that there was blood on the "[s]teering wheel." "There was a lot of blood," and that defendant told him he was coming from the parking lot of Bucco's and Joey's Nightclub ("Joey's"), which is attached to the restaurant.
Patrol cars were subsequently dispatched to the scene but no suspects were found. Defendant was taken to the hospital. At the hospital, defendant furnished Officer Stine with the name and description of an individual. However, no one fitting that description was found. Furthermore, Officer Stine testified that when he first stopped defendant, he saw no sign of the individual described by defendant.
At the hospital, defendant was treated for his injuries, including a broken nose, lacerations, bruises and cuts. Due to the smell of alcohol on defendant's breath, Officer Stine requested that blood be drawn to determine defendant's blood alcohol content. The result of the blood test, which was stipulated to by defense counsel, revealed that defendant had a blood alcohol level of .16.
In the municipal court trial, defendant testified that on November 30, 1999, at 9:30 p.m., he and his girlfriend Dana Corolla went to Bucco's[2] for dinner. Defendant and Corolla had dinner and drinks and then moved to the bar around 10:30 p.m., where they engaged in social conversation with the restaurant proprietor's son, Frank Bucco, Jr., ("Bucco, Jr.") and his girlfriend, Jeanine Gingarelli. At some point, while the men were discussing sports, Corolla and Gingarelli left to see defendant's new apartment after making arrangements to return to pick up defendant.
At about 1:45 a.m., defendant went into the bathroom at Bucco's and was approached by three men who "smacked [him around]" and claimed he knew someone who "owed them money." Defendant believes that Bucco, Jr., may have had something to do with the attack because he and Bucco, Jr., had been arguing at the bar about sports and Bucco, Jr., disappeared around the same time. Defendant left the bathroom and went outside to the parking lot to await Corolla's return. While in the parking lot, defendant was struck from behind by two men, who pulled him on top of a car while a third man proceeded to beat him in the face. Defendant testified that the beating on the car felt like forever but may have been only four or five minutes long. Defendant *161 fell off the car to the ground and his attackers continued to "[t]o kick [him], punch [him], pulled [his] hair, kicking [him] under the car." Defendant testified that he was struck all over and even his ring was bent. "They were stepping on [him]."
Defendant testified that he somehow managed to break free and ran to his car, which was parked approximately fifteen feet away on the side of the building. His attackers pursued him but he managed to get into his car because the driver's side door was broken and remained unlocked. He locked the door from the inside, but the attackers jumped onto the hood of his car, shook and kicked the car and screamed "come out here, we're going to get you, you're dead after this, you'll see what's going to happen...." Defendant testified that there was no one else in the parking lot at the time of the incident and "[he] got scared and [he] just started the car and [he] had to get out of there" because the assailants were threatening "to kill [him]." As he drove out of the parking lot, defendant saw a police cruiser in front of him. He stated that he was relieved to see the police car because he feared that his attackers would chase after him. He testified that he felt the timely presence of Officer Stine at the scene "might have possibly saved [his] life."
Defendant further testified that he did not have a cell phone or any other means of seeking assistance from his car. He testified that he drove out of Bucco's parking lot about "100 to 150 feet," before being pulled over by Officer Stine. Defendant admitted driving without his headlights on, but stated "[he] was confused... [he] couldn't describe it. You know it was fear for [his] life basically and shaken up and [he] wasn't concentrating on the headlight." He further testified that he knew he was seriously injured upon entering his vehicle because "[i]t felt like water on [his] face and it was blood and it was all over [him], ... from head to shoes, covered in blood." A blood soaked sweater and a pair of pants were admitted into evidence, and identified as the garments defendant was wearing at the time of the beating.
Defendant also testified that he did not know his attackers and had never seen them "before in [his] life." He testified that he believed his assailants' threats to kill were serious stating: "[m]ost definitely, most definitely. [T]hey just wouldn't stop. They just kept hitting and screaming and punching, kicking. It was a mess."
Defendant was charged with DWI, failure to wear a seatbelt, N.J.S.A. 39:3-76.2f; and failure to use headlights, N.J.S.A. 39:3-47. In the municipal court, defendant was convicted of DWI and failure to use headlights. He was acquitted of failure to wear a seatbelt. The municipal court judge merged the headlight conviction with the DWI conviction and imposed a sentence in accordance with the DWI statute.
Defendant filed a de novo appeal to the Law Division. Defendant reasserted the defense of necessity. After noting the absence of findings of fact by the municipal court, the judge concluded that defendant asserted the common-law defense of duress. In rejecting this defense, the judge said in part:
Here, the defendant obviously sustained injuries as a result of an attack. This court does not denigrate defendant's harsh situation. However, the potential for pretext in a self-defense DWI defense is great. In this case no perpetrators were found, no disturbances were called in to the police, no witnesses were interviewed, and no charges were filed for assault. In addition, the record does not show that defendant had no options *162 in regard to the necessity of driving to protect himself from his assailants. Could he have gone into a nearby establishment or pay phone to call for help? Could he have driven to a safe place in the parking lot and wait until he could obtain help? (Although this option would still constitute DWI, it would lend credence to defendant's exhaustion of options prior to driving on public highways.) The burden of proof is on defendant to prove by preponderance of the evidence that he was coerced into driving by his attackers. Reading the record below, defendant has not carried this burden....
In reaching this decision, the judge relied upon State v. Toscano, 74 N.J. 421, 442, 378 A.2d 755 (1977), and stated that defendant had the burden of persuasion and must establish the defense by a preponderance of the evidence. Defendant was found guilty of DWI and an appropriate sentence was imposed.

II
We begin by noting that our normal standard of review on an appeal from a trial de novo in the Law Division is to determine whether there is "sufficient credible evidence" in the record to support the findings by the Law Division judge. State v. Locurto, 157 N.J. 463, 470-71, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 162, 199 A.2d 809 (1964). But a trial judge's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty v. Manalapan Township Committee, 140 N.J. 366, 378, 658 A.2d 1230 (1995) (citing State v. Brown, 118 N.J. 595, 604, 573 A.2d 886 (1990)).
Here, we have an established set of underlying facts that are conceded by the State. The question we must resolve is whether on this set of facts, the common-law defense of necessity applies, so as to warrant an acquittal of the DWI charge. We conclude that it does.
Defendant argues that he has established the defense of necessity pursuant to N.J.S.A. 2C:3-2(a). The State, although conceding the underlying facts, asserts that defendant is not entitled to the defense of necessity, or duress, because of the strong public policy against DWI and because DWI is a per se offense when a driver's blood alcohol level is .10 or above.
Motor vehicle offenses, including DWI, "are not offenses under New Jersey's Criminal Code." State v. Fogarty, 128 N.J. 59, 64, 607 A.2d 624 (1992); State v. Hammond, 118 N.J. 306, 312, 571 A.2d 942 (1990); Cannel, New Jersey Criminal Code Annotated, comment 3 on N.J.S.A. 2C:2-9 (2002). A person is in violation of New Jersey's DWI Statute if he or she operates a motor vehicle with a blood alcohol concentration of 0.10% or more. N.J.S.A. 39:4-50. Violation of the statute is a per se offense. State v. Fogarty, 128 N.J. 59, 68, 607 A.2d 624 (1992). However, a person "charged with a motor vehicle offense does not forfeit all constitutional and common-law defenses." Id. at 64, 607 A.2d 624. "[C]ommon-law defenses may be available as long as they have not been precluded by the statute defining the offense." Id. at 70, 607 A.2d 624.
Because DWI is not an offense under the New Jersey Criminal Code, we must look to the common-law defense of "necessity" for guidance. "The common-law defense of `necessity' is often referred to as the `choice-of-evils' defense." State v. Tate, 102 N.J. 64, 73, 505 A.2d 941 (1986)(citing W. Lafave and A. Scott, Handbook on Criminal Law 382 (1972)). "Conduct that would otherwise be criminal is justified if the evil avoided is greater *163 than that sought to be avoided by the law defining the offense committed, or, conversely, if the conduct promotes some value higher than the value of compliance with the law." Ibid. (citing Arnolds & Garland, The Defense of Necessity in Criminal Law: The Right to Choose the Lesser Evil, 65 J.Crim. L. Criminology, 289 (1974)).
The elements of the common-law defense of necessity are:
(1) There must be a situation of emergency arising without fault on the part of the actor concerned;
(2) This emergency must be so imminent and compelling as to raise a reasonable expectation of harm, either directly to the actor or upon those he was protecting;
(3) This emergency must present no reasonable opportunity to avoid the injury without doing the criminal act; and
(4) The injury impending from the emergency must be of sufficient seriousness to outmeasure the criminal wrong.
[State v. Tate, 194 N.J.Super. 622, 628, 477 A.2d 462 (App.Div.1984), rev'd on other grounds, 102 N.J. 64, 505 A.2d 941 (1986).]
The "necessity" defense is based on public policy. Essentially, "it reflects a determination that if, in defining the offense, the legislature had foreseen the circumstances faced by the defendant, it would have created an exception." State v. Tate, supra, 102 N.J. at 73, 505 A.2d 941. Thus, "the defense is available at common law only when the legislature has not foreseen the circumstances encountered by a defendant." Id. at 74, 505 A.2d 941. If the legislature "has in fact anticipated the choice of evils and determined the balance to be struck between the competing values, defendants and courts alike are precluded from reassessing those values to determine whether certain conduct is justified." Ibid.
The application of the above standard leads us to conclude that defendant is entitled to the common-law defense of necessity in the circumstances presented here. All the elements of the defense are present. We are satisfied that the Legislature did not weigh the competing value of driving while intoxicated to escape a brutal, and possibly deadly attack, against the values served by ridding the roads of drunk drivers. The Legislature did not provide "exceptions or defenses dealing with the specific situation" facing defendant, nor did it make plain its purpose to exclude this defense under the circumstances presented here. Id. at 70, 505 A.2d 941; N.J.S.A. 2C:3-2a.
We recognize the State's concern for pretextual defenses in a DWI prosecution and those concerns have been expressed by our courts in different contexts and have resulted in the denial of various defenses to DWI prosecutions. In State v. Inglis, 304 N.J.Super. 207, 698 A.2d 1296 (Law Div.1997), defendant was charged with DWI after he lost control of his vehicle which became airborne and crashed into the roof of several tollbooths. Id. at 209, 698 A.2d 1296. The defendant raised the defense of insanity based on the fact that he had a long history of "psychiatric treatment related to depression and alcohol abuse." Ibid. The court held that the common-law insanity defense was not available to defendants charged with drunk driving. Id. at 211, 698 A.2d 1296. In its opinion, the court stated that "the insanity defense has a high potential for... pretext." Id. at 212, 698 A.2d 1296. The court stated further that "[w]hen evaluating whether a particular defense has a high potential for pretext, [courts should] focus ... on the ease with which ... defendant[s] *164 can allege a frivolous defense." Ibid.
Likewise, in Fogarty, the defendant left a wedding reception and a fight broke out between two of his friends over who would drive the defendant home. Fogarty, supra, 128 N.J. at 62, 607 A.2d 624. The police arrived to break up the fight and ordered the defendant to leave in his vehicle. The defendant ignored the order and was led to his vehicle by one of the officers who told him to "`get in the truck and get out of here or you're going [to be arrested] too.'" Id. at 63, 607 A.2d 624. The defendant then backed his vehicle into a parked police vehicle and was arrested and charged with DWI. Defendant alleged that he was entrapped because but for the order of the police he would not have driven his vehicle. Id. at 64, 607 A.2d 624.
The Court held that the defendant was not entitled to rely on the "quasi-entrapment" defense even if he could show that but for the police order, he would not have driven his truck. Id. at 67, 607 A.2d 624. The Court concluded that "because [the] defendant's blood-alcohol level was .12%, he was per se guilty of DWI." Id. at 68, 607 A.2d 624.
Furthermore, the Court held that the facts did not suggest that the police engaged in egregious conduct, particularly because they were unaware that the defendant was drunk, and "did not plant a criminal plan in [the] defendant's mind." Id. at 66, 607 A.2d 624. Thus, the defendant should have advised the police officer that he was drunk and sought an alternative to violating the law. Id. at 67, 607 A.2d 624. The Court opined that the defendant's subjective belief that he had no other alternative was irrelevant. Ibid.
In addition, the Fogarty Court also expressed its concern regarding pretextual defenses. It stated that: "[T]he Legislature has sought `to discourage long trials complicated by pretextual defenses.'" Ibid. (citation omitted). The Court further stated that "[i]n our DWI decisions we attempt to eliminate every possibility of pretextual defenses ... not only because of any doubts about the veracity of the factual defense offered, but also because of the potential for pretext." Id. at 68, 607 A.2d 624.
However, Justice Stein, in his dissent, stated that:
A conviction for driving while intoxicated (DWI) ordinarily is not an occasion for hand-wringing about issues of fundamental fairness and due process.... Our decisions confirm this Court's determination to enforce strictly the strong legislative policy to impose swift and certain punishment on those who would drive a motor vehicle while under the influence of alcoholic beverages. See State v. Hammond, 118 N.J. 306, 571 A.2d 942 (1990); State v. Tischio, 107 N.J. 504, 527 A.2d 388 (1987); appeal dismissed, 484 U.S. 1038, 108 S.Ct. 768, 98 L.Ed.2d 855 (1988).
....
But once in a great while a DWI case comes along that presents facts so bizarre and remote from the public policy underlying the law that even a Court as committed as this one to the strict enforcement of the drunk-driving statutes can pause to make certain that no injustice has been done. The comedy of errors that placed defendant ... behind the wheel of his trucknotwithstanding his carefully having arranged for friends to drive him to and from the wedding...bears little relation to the irresponsible conduct courts typically encounter in DWI cases.
[Id. at 74-75, 607 A.2d 624.]
Similarly, in Hammond, as a practical joke, the defendant's drinks were mixed in *165 a manner that disguised the taste of alcohol. Hammond, supra, 118 N.J. at 307, 571 A.2d 942. The defendant was pulled over by a police officer because the defendant's vehicle was moving very slowly and accelerating and braking excessively. Id. at 308, 571 A.2d 942. The defendant was charged with DWI. He raised the defense of involuntary intoxication because he was unaware that he had consumed alcohol when he began driving his car. The Court held that "involuntary intoxication" as an affirmative defense was not available in drunk driving cases. Id. at 318, 571 A.2d 942. The Court further held that the defendant's subjective belief was irrelevant. Id. at 316, 571 A.2d 942.
Those cases are easily distinguishable from the case here. In each of those cases, the defendants were partially responsible for creating the situation which gave rise to the harm to be avoided. Here, defendant was attacked by three unknown men. Thus, he did not create or participate in the circumstances bringing about the harm he sought to avoid. Furthermore, this case is distinguishable on its facts, because defendant had no other reasonable alternatives available to him, whereas, in the cases cited above, the defendants had several other alternatives available to them. In addition, the gravity of the harm defendant faced in this case was significantly higher than the harm faced by the defendants in the above referenced cases.
We are satisfied that this case is one in a category discussed by Justice Stein in his dissent in Fogarty. Here, the "facts [are] so bizarre and remote from the public policy underlying the law that even a[c]ourt as committed as this one to the strict enforcement of the drunk-driving statutes can pause to make certain that no injustice has been done." Fogarty, supra, 128 N.J. at 74, 607 A.2d 624. To not apply the defense of necessity in these circumstances is to allow an injustice.
Courts in other jurisdictions have considered necessity as a justification for violating DWI statutes. In People v. Pena, 197 Cal.Rptr. 264 (Cal.Ct.App.1983), a deputy sheriff observed the defendant and his girlfriend asleep in his car and decided to investigate because of the late hour. Id. at 266. Upon approaching the car, the deputy stated that he smelled alcohol. Id. at 267. The defendant's girlfriend was semi-nude, wearing only a long fur coat over a "brief see-through teddy nightgown." Ibid. The deputy conducted what he said was a search for weapons, examining the woman's body under her coat with a flashlight and continuing his examination of the rear of the woman. Subsequently, he ordered her into his vehicle to take her home, assertedly for her protection. Ibid. The defendant testified that he followed them out of fear for his girlfriend's safety, and was arrested at the girlfriend's house for driving while intoxicated. Ibid.
The California Court of Appeals held that the defense was available to the defendant and that he would be entitled to an acquittal, notwithstanding the fact that he was legally intoxicated, if he could establish the defense on the facts by convincing the jury that: (1) "he held a genuine belief that [his girlfriend] was in danger of assault by or through [the][d]eputy"; (2) the defendant's "good faith belief was objectively reasonable under the totality of the circumstances"; (3) the defendant "operated his vehicle in obedience to his fear for [his girlfriend's] safety and not for any other purpose"; (4) the defendant "had no opportunity to engage in alternative legal means of protecting [his girlfriend] from the danger he believed she faced"; and (5) the defendant "was not substantially at fault in the creation of the emergency *166 situation which he claims justifies his action in driving while intoxicated." Id. at 272.
Likewise, in State v. Knowles, 495 A.2d 335, (Me.1985), aff'd on appeal after remand, 517 A.2d 1075 (Me.1986), the defendant had gone to a hotel in his van with several companions, one of whom drove. Id. at 337. Upon reaching the parking lot, the defendant exited the van and went alone to the hotel bar to meet a female friend. At the bar, a confrontation occurred and he was assaulted and beaten by several bar patrons. Ibid. The defendant left the bar and called the police. He then returned to the bar to get his keys and was again assaulted and beaten. After this beating, the defendant walked to the police department to seek assistance. The officers observed the defendant's intoxicated condition and warned him not to drive anywhere. Ibid. However, the defendant returned to the parking lot and attempted to re-enter the bar but was once again assaulted and beaten. The defendant's friends had left the area on foot. Ibid.
While the defendant was being beaten, his female friend appeared and they both entered the van. She drove and defendant sat in the passenger seat. They proceeded to a nearby pay phone. Ibid. While the female friend was attempting to phone the police, the assailants approached the van and the defendant began looking for his shotgun. He was in the driver's seat when a police cruiser arrived. Ibid. The police officer testified that he observed defendant's vehicle proceeding out of the parking lot and followed it to where it stopped. The officer stated that defendant was driving the van and no one else was in the van. Defendant denied operating the van. Id. at 337-38.
A Maine statute provided that: Conduct which the actor believed necessary to avoid imminent physical harm to himself or another is justifiable if the desirability and urgency of avoiding such harm outweighed ... the harm sought to be prevented by the statute defining the crime charged.
[Me.Rev.Stat. Ann. tit. 17-A, § 103 (2001).]
The Maine Supreme Court held that the defendant was entitled to a jury instruction on the "competing harms" defense when he could point to sufficient evidence "`to make the existence of all the facts constituting the defense a reasonable hypothesis for the factfinder to entertain.'" Knowles, supra, 495 A.2d at 338 (quoting State v. Glidden, 487 A.2d 642, 644 (Me.1985)).
Similarly, in State v. Shotton, 142 Vt. 558, 458 A.2d 1105 (1983), a woman who was brutally beaten and shoved down stairs by her husband drove herself to the hospital while under the influence of alcohol. The court held that "her need for treatment, as she conceived it to be, outweighed the criminal wrong of driving under the influence." Id. at 1106.
Here, like the defendant in Shotton, defendant, at 2:18 a.m., was brutally beaten and was faced with three angry men who were intent on continuing to beat him. Defendant's car was being shaken, kicked, and rocked, with his attackers threatening to kill him. Defendant had no realistic alternative but to violate the DWI statute.
Defendant's last point is that the Law Division judge erroneously concluded that defendant was asserting the defense of duress. We agree that the judge erred and are satisfied, as noted above, that defendant presented and established the common-law defense of necessity. We are also satisfied that the Law Division judge improperly shifted the burden of proof with respect to the defense to defendant.
In reaching his decision, the judge erroneously relied on State v. Toscano, 74 *167 N.J. 421, 442, 378 A.2d 755 (1977). Toscano, which was decided before the Code was adopted, placed the burden of production and persuasion on the defendant on the issue of duress. N.J.S.A. 2C:2-9, was adopted after Toscano was decided and places the burden on the defendant to come forward with some evidence of the defense and the burden of proof on the State to disprove the affirmative defense beyond a reasonable doubt. State v. Galiyano, 178 N.J.Super. 393, 397, 429 A.2d 385 (App.Div.), certif. denied, 87 N.J. 424, 434 A.2d 1096 (1981).
We are satisfied that the same result applies here in this DWI prosecution. Defendant must come forward with some evidence of the defense, but the State bears the ultimate responsibility to disprove the defense beyond a reasonable doubt. The State conceded that the Law Division judge erred in this context.
We reverse defendant's DWI conviction.
NOTES
[1] Officer Stine's version of the distance contradicts defendant's in that defendant testified that he traveled approximately 100 to 150 feet before he was pulled over. Under the circumstances presented here, we do not deem this dispute in testimony significant. In a DWI prosecution, the distance a driver traveled might be relevant to the defense of necessity if the driver had escaped the harm and continued to drive.
[2] Bucco's is located next to Joey's nightclub.