**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4638-15T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

WAYNE J. JOHNSON, JR.,
a/k/a WAYNE JAMEEL JOHNSON,

     Defendant-Appellant.

_____

Submitted November 9, 2018 – Decided April 30, 2019

Before Judges Whipple and DeAlmeida.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Indictment No. 13-06-1855.

Joseph E. Krakora, Public Defender, attorney for appellant (Peter T. Blum, Assistant Deputy Public Defender, of counsel and on the brief).

Mary Eva Colalillo, Camden County Prosecutor, attorney for respondent (Patrick D. Isbill, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Wayne J. Johnson, Jr. appeals his convictions of two aggravated assault counts and two weapon-possession counts, as well as the sentences he received for those convictions. We affirm defendant's convictions. However, we vacate the sentence imposed on the weapon-possession count of which defendant was acquitted, direct that defendant be sentenced on the weapon-possession count of which he was convicted but for which he received no sentence, and conclude that the two aggravated assault counts should have been merged. We therefore remand the matter for resentencing and correction of the judgment of conviction to accurately reflect the jury's verdict.

I.

Shortly before midnight on November 15, 2012, Christopher Giles was alone in bed at his home in Camden County. He lived with his daughter, who was not home at that time, and his son, codefendant Justin Angelino. Giles was not in contact with his son for most of Angelino's life, having lost touch with him when he was a child. The two reunited in October 2011, when Angelino, by then an adult, began to live with his father. Giles described his relationship with his son during their cohabitation as infused with hostility and tension. Although the two had exchanged angry words, they had not had a physical altercation. On the night in question, Giles was not expecting Angelino at the

residence because he received a text message from his son stating that he was going to visit his aunt.

At approximately 3:00 a.m., Giles woke up to use the bathroom. He encountered his son and defendant walking from the hallway into Giles's bedroom. Although the lighting was low, Giles recognized defendant, who he had met at least two times before, as his son's acquaintance. Giles was surprised to see them both, in light of his son's earlier text message. After engaging in short conversation with the two men, Giles returned to bed.

Video from a nearby Walmart showed Angelino and defendant shopping at approximately 3:30 a.m. Angelino paid for several items. It was later discovered that charges were made on Giles's credit card at that hour. Giles had not authorized the use of his card.

At approximately 5:00 a.m., Giles awoke to find Angelino and defendant in his bedroom. Angelino was approximately three feet away from Giles, turned to him and said, "hey, Dad, here's your rent, I'm going to put it on the desk here." According to Giles, immediately thereafter Angelino and defendant began pummeling, bludgeoning, and stabbing him. He was "surprised, shocked, confused, [and] angry" by the unprovoked attack. Giles remembered getting hit on the left side of the head with a blunt object, and heading toward

3

unconsciousness.  He attempted to sit up and defend himself, but the attack, which lasted one or two minutes, suddenly stopped.  Angelino and defendant left the residence.

Giles tried to get out of bed, finding it difficult to stand because he was bleeding profusely and there was so much blood on the floor that his bare feet were slipping.  He applied a towel to a wound on his arm and dialed 9-1-1.  Giles told the dispatcher that his son and "a friend of his" had attacked him.  Giles did not identify defendant by name or give a physical description of him.  He told the dispatcher that he could not locate his wallet, which he kept in his bedroom.

At a trauma center, a plastic surgeon reattached Giles's ear, and repaired his upper lip, which had been slashed.  An examination revealed that one of his triceps was detached, requiring an emergency surgical repair.  Giles also suffered ulnar nerve damage, leaving two of his fingers numb on his dominant hand.  Damage to Giles's thumb muscle seriously impaired his use of that finger.  Giles described himself as "maimed and disfigured" from cuts to his face, scalp, and body during the attack.

Investigating officers found a barbell on Giles's bloody bed, a fake handgun on the bedroom floor, and in the bathroom an open folding knife with the blade extended, a white t-shirt, and a blood-stained towel.  The walls, door,

floor, and furniture in the bedroom were smeared with blood, as was the kitchen table and walls, the entrance of the residence, the wall leading to the bathroom, the bathroom, and the walls and floor of the hallway leading to the bedroom.

While being interviewed by detectives, Giles identified his son and "another man" as the assailants. Officers found a bag of items that did not belong to Giles in his car, along with his wallet. Giles testified that he kept his car keys next to his wallet in his bedroom.

An officer conducting a perimeter search in the area of Giles's residence observed what he believed to be a male figure, later identified as defendant, moving in a crouched manner across the front of a building. When stopped by the officer, defendant had a large area of blood on his shirt and blood on his hands. He told the officer that he had been stabbed in his chest, abdomen, and hands. A medical examination revealed cuts and lacerations on defendant's hands, but no wounds to his chest or abdomen.

While being treated by medical personnel in an ambulance, and without commands or instructions from the officer, defendant made statements about the assault on Giles. According to the officer,

> [h]e said, along the lines of, I didn't want to do it, white boy made me do it. And he made the statement of [sic] he didn't want to hurt that man. White boy held a gun to me and said if I didn't kill him, he would kill me.

5 <span style="float:right">A-4638-15T2</span>

And then he asked is he okay? White boy made me do it, I believe.

While in the emergency department, another officer heard defendant, without prompting by the officer, ask "how the person he had assaulted, attacked, how he was doing." In addition, when asked by medical personnel how he was injured, defendant stated that he cut himself. An expert witness testified that blood on defendant's tank top belonged to Giles.

A Camden County grand jury charged defendant with: first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3; first-degree robbery, N.J.S.A. 2C:15-1(a)(1); second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15(a)(1); second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1); third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(2); third-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(d); fourth-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(d); and fourth-degree possession of an imitation firearm, N.J.S.A. 2C:39-4(e).[1]

At trial, defendant's counsel argued that there was doubt as to the identity of the person who assisted Angelino in attacking Giles because: (1) Giles never

---

[1] Angelino appeared at his father's apartment shortly after the attack with his clothes disheveled and splattered with blood. Police immediately arrested him. The indictment against defendant also lodged charges against Angelino. The two were tried separately.

expressly identified defendant as one of his attackers; (2) there was no direct proof that defendant participated in the attack; (3) the wounds on defendant's hands suggested he was attempting to help Giles and stop the attack; (4) there were questions regarding the methods used to collect the shirt attributed to defendant that was stained with Giles's blood; and (5) defendant had no motive to attack Giles. Defense counsel argued to the jury that it was "critically important" to make sure that the "correct perpetrator of the crime" be identified.

Defendant did not testify. However, his statement in the ambulance that he participated in the assault only because he had been threatened by Angelino was admitted into evidence. Defendant's counsel did not seek a jury instruction on the affirmative defense of duress. See N.J.S.A. 2C:2-9(a). At the conclusion of trial, the court dismissed the two counts of the indictment charging robbery and conspiracy to commit robbery for insufficient evidence.

The jury convicted defendant of second-degree aggravated assault, third-degree aggravated assault, third-degree possession of a weapon for an unlawful purpose, and fourth-degree possession of a weapon. The jury acquitted defendant of attempted murder and possession of an imitation firearm.

For second-degree aggravated assault, the court sentenced defendant to eight years of imprisonment, with an eighty-five percent period of parole

ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. The court imposed a concurrent sentence of four years of imprisonment for third-degree aggravated assault. The court merged the third-degree possession of a weapon count into the second-degree assault count.

It appears that because of a change in the numbering of the counts after dismissal of the robbery counts, the court transposed two of the weapons counts at sentencing. The court imposed no sentence on the fourth-degree unlawful possession of a weapon count, of which defendant was convicted. In addition, the court imposed a consecutive sentence of fifteen months on the fourth-degree possession of an imitation firearm count, of which defendant was acquitted.

This appeal followed. Before us, defendant argues:

> POINT I
>
> A NEW TRIAL IS REQUIRED BECAUSE THE COURT FAILED TO INSTRUCT THE JURY ON THE DURESS DEFENSE, EVEN THOUGH THE EVIDENCE INCLUDED JOHNSON'S STATEMENT THAT HE WAS THREATENED WITH DEATH AND FORCED AT GUNPOINT TO PARTICIPATE IN THE ASSAULT. U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, PARA. 1. (not raised below).
>
> POINT II
>
> A RESENTENCING IS REQUIRED FOR THE COURT TO VACATE THE SENTENCES ON COUNTS FIVE AND EIGHT AND TO MAKE A

DISPOSITION ON COUNT SEVEN. (not raised below).

A.   The Court Should Have Merged Assault Count Five into Assault Count Four Because a Single Assault Occurred.

B.   The Court Mixed Up the Counts; Failed to Make a Disposition on Count Seven, on Which Johnson Had Been Convicted; and Imposed a Sentence on Count Eight, on Which Johnson Had Been Acquitted.

POINT III

A RESENTENCING IS REQUIRED BECAUSE THE SENTENCING COURT IMPROPERLY FAILED TO ALLOW JOHNSON TO ALLOCUTE IN SUPPORT OF MITIGATING FACTORS. (not raised below).

II.

A.   <u>Jury Instructions.</u>

Defendant argues that the trial court erred by not sua sponte instructing the jury regarding the affirmative defense of duress. It is well-settled that "[a]ccurate and understandable jury instructions in criminal cases are essential to a defendant's right to a fair trial." State v. Concepcion, 111 N.J. 373, 379 (1988). However, "[i]f the defendant does not object to the charge at the time it is given, there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." State v. Singleton, 211 N.J. 157, 182 (2012).

9

Therefore, "the failure to object to a jury instruction requires review under the plain error standard." State v. Wakefield, 190 N.J. 397, 473 (2007).

> As applied to a jury instruction, plain error requires demonstration of "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)).]

The mere possibility of an unjust result is not enough to warrant reversal of a conviction. State v. Jordan, 147 N.J. 409, 422 (1997). The error "must be evaluated in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting Chapland, 187 N.J. at 289).

When considering whether to charge a jury sua sponte with an affirmative defense, a trial court must apply the standard applicable to its duty to charge the jury sua sponte with a lesser-included offense. Id. at 86-87. A trial court need not "sift through the entire record . . . to see if some combination of facts and inferences might rationally sustain" the defense. State v. R.T., 205 N.J. 493, 509 (2011) (Long, J., concurring) (quoting State v. Choice, 98 N.J. 295, 299 (1985)). Rather, when "counsel does not request the instruction, it is only when the evidence clearly indicates the appropriateness of such a charge that the court

should give it." Walker, 203 N.J. at 87 (footnote omitted). "[T]he need for the charge must 'jump off' the proverbial page." R.T., 205 N.J. at 510 (Long, J., concurring).

Prior to giving a sua sponte charge, the court must also consider other factors. "Those factors include whether counsel is surprised, how the case was tried, whether the defense is incompatible with defendant's position at trial, or whether the instruction would prejudice the defense in some way." Ibid. (Long, J., concurring). When a jury charge is "so inconsistent with the defense as to undermine the fairness of the proceedings, the trial court may" not issue the sua sponte charge. State v. Garron, 177 N.J. 147, 181 (2003). "Obviously, strategy takes on added significance where a charge regarding an affirmative defense is at issue . . . [as] a defendant generally has a right to defend a case as he sees fit." R.T., 205 N.J. at 510 (Long, J., concurring). "All affirmative defenses from self-defense, to insanity, have, at their core, the notion that a defendant has indeed committed the interdicted act but that he should be excused from its consequences." Id. at 511 (Long, J., concurring) (citations omitted).

Duress is codified as an affirmative defense applicable when

> the actor engaged in the conduct charged to constitute
> an offense because he was coerced to do so by the use
> of, or a threat to use, unlawful force against his person
> or the person of another, which a person of reasonable

11

> firmness in his situation would have been unable to resist.
>
> [N.J.S.A. 2C:2-9(a).]

"[T]he burden [is] on the defendant to come forward with some evidence of [duress] and the burden of proof [is] on the State to disprove the affirmative defense beyond a reasonable doubt." State v. Romano, 355 N.J. Super. 21, 35-36 (App. Div. 2002).

After a careful review of the record, we agree with the State's argument that the trial court's failure to sua sponte instruct the jury on the affirmative defense of duress was not plain error. The only evidence suggesting defendant was coerced into attacking Giles was his bare statement while being treated in an ambulance shortly after the attack. Neither defendant nor Angelino testified. The record, therefore, contained no further evidence regarding when, how, or where Angelino allegedly threatened defendant or whether a person of reasonable firmness in defendant's situation could have resisted the alleged threat. Defendant's statement, standing alone, was insufficient to have the affirmative defense "jump off" the page, requiring the trial court's intervention despite defense counsel's failure to ask for the duress instruction.

Moreover, at trial, defense counsel's primary strategy was to argue that there was uncertainty as to the identity of the person who participated with

Angelino in attacking his father because there was no direct evidence linking defendant to the assault. During summation, defense counsel argued that the evidence produced at trial did not "suggest or prove . . . beyond a reasonable doubt that [defendant] was there attacking this victim" and that it was important that the "correct perpetrator of the crime" be identified.

After trial, defense counsel acknowledged defendant's strategic decision not to pursue a duress defense. In a letter to the court prior to the second sentencing hearing, defense counsel stated, "Mr. Johnson indicates that his co-defendant held a gun to his head and forced him to commit the crime. Although Mr. Johnson strategically decided not to pursue that fact during the trial, he would like the court to consider it for sentencing purposes[.]" Had the court sua sponte instructed the jury on duress, defendant's theory of the case would have been undermined, as the jury might have viewed the instruction as a sign that the court considered the evidence to prove defendant participated in the attack.

B.     <u>Merger of the Aggravated Assault Convictions.</u>

"Appellate courts review sentencing determinations in accordance with a deferential standard." <u>State v. Fuentes</u>, 217 N.J. 57, 70 (2014). "Merger is based on the principle that 'an accused [who] has committed only one offense . . . cannot be punished as if for two.'" <u>State v. Miller</u>, 108 N.J. 112, 116 (1987)

(alteration in original) (quoting State v. Davis, 68 N.J. 69, 77 (1975).  Merger prohibits "double punishment for the same offense[,]" Davis, 86 N.J. at 77, and "implicates a defendant's substantive constitutional rights[,]" State v. Tate, 216 N.J. 300, 302 (2013) (quoting Miller, 108 N.J. at 116).

"N.J.S.A. 2C:1-8(d) calls for merger when one offense is established by proof of the same or less than all of the facts required to establish the commission of another offense charged[.]" State v. Mirault, 92 N.J. 492, 502 n.10 (1983).  Our courts follow a "flexible approach in merger issues that requires us to focus on the elements of the crimes and the Legislature's intent in creating them, and on the specific facts of each case." State v. Brown, 138 N.J. 481, 561 (1994) (quotation omitted).  The Legislature may "split a single, continuous transaction into stages, elevate each stage to a consummated crime, and punish each stage separately." Davis, 68 N.J. at 78.  "The cases not requiring merger have had clear statutory differences illustrating legislative intent to fractionalize a course of conduct." Tate, 216 N.J. at 312.  The court must determine whether the two offenses are the same and therefore merge, or whether "each [offense] requires proof of an additional fact[,] which the other does not[,]" making merger inapplicable. State v. Dillihay, 127 N.J. 42, 48

(1992) (first alteration in original) (quoting <u>Blockburger v. United States</u>, 284 U.S. 299, 304 (1932)).

A defendant commits second-degree aggravated assault under N.J.S.A. 2C:12-1(b)(1), when he or she "[a]ttempts to cause serious bodily injury to another, or causes such injury purposely or knowingly or under circumstances manifesting extreme indifference to the value of human life recklessly causes such injury[.]" Whereas a defendant commits third-degree aggravated assault under N.J.S.A. 2C:12-1(b)(2) when he or she "[a]ttempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon[.]" A serious bodily injury "means bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ" while a bodily injury "means physical pain, illness or any impairment of physical condition[.]" N.J.S.A. 2C:11-1 (a) to (b).

Two conflicting precedents from this court influence the analysis of the question before us. In <u>State v. Jones</u>, 214 N.J. Super. 68, 70-71 (App. Div. 1986), the defendant was charged with violating N.J.S.A. 2C:12-1(b)(1) for shooting a coworker. After the jury stated it was having difficulty reaching a verdict, the court sua sponte instructed the jury that it could consider the lesser-

included offense of fourth-degree aggravated assault, N.J.S.A. 2C:12-1(b)(3), by recklessly causing bodily injury with a deadly weapon.  Id. at 71-72.  The jury then convicted the defendant of that charge.  Id. at 72.

On appeal, the defendant argued that a (b)(3) aggravated assault is not a lesser included offense of a (b)(1) aggravated assault.  Ibid.  We examined the elements of the various types of aggravated assault:

> [T]he gravamen of the (b)(1) crime is the seriousness . . . of the bodily injury actually inflicted or attempted to be inflicted.  The bodily injury component of both the (b)(2) and the (b)(3) is satisfied by the lesser degree of bodily injury . . . .  Thus, the bodily injury component of the (b)(1) crime obviously encompasses the bodily injury component of the (b)(2) and the (b)(3) crimes.  If that, however, were the only component of the (b)(2) and the (b)(3) crimes, they would not be aggravated assaults but rather simple assaults as defined by N.J.S.A. 2C:12-1(a)(1).  What makes the (b)(2) and (b)(3) crimes aggravated assaults is the second element, namely, that the bodily injury was inflicted or attempted to be inflicted with a deadly weapon.  This element of a deadly weapon is not an element of the (b)(1) crime.
>
> The question then is whether this added element of the (b)(2) and (b)(3) crimes precludes their categorical encompass by the (b)(1) crime.  We conclude that the code itself compels an affirmative answer.
>
> [Id. at 73.]

Less than two years later, in State v. Graham, 223 N.J. Super. 571 (App. Div. 1988), we again addressed whether a (b)(3) aggravated assault is a lesser-included offense of a (b)(1) aggravated assault. In that case, the defendant was charged with a (b)(1) aggravated assault after he shot and seriously injured his wife with a handgun during an argument. Id. at 573-74. After a bench trial, the court acquitted the defendant of the (b)(1) aggravated assault, but found him guilty of what the court concluded was the lesser-included (b)(3) offense. Id. at 575. On appeal, the defendant argued that a (b)(3) aggravated assault is not a lesser included offense of a (b)(1) aggravated assault. Ibid.

We summarized the legal precedents as follows:

> The issue has been decided both ways in reported Law Division opinions. Judge Stern held that b(3) assault is "undoubtedly" included in a b(1) assault. State v. Berrios, 186 N.J. Super. 198, 203 (Law Div. 1982). Judge Villanueva held that it is not. State v. Mincey, 202 N.J. Super. 548, 555-56 (Law Div. 1985). Another part of this court agreed with Judge Villanueva and relied on his reasoning. [Jones, 214 N.J. Super. at 73-74]. Later Judge Stern, now writing for this court, questioned the soundness of Jones on policy grounds but did not decide the issue. State v. Sloane, 217 N.J. Super. 417, 421-23, 423 n.2 (App. Div. 1987)[.]
>
> . . . .
>
> Mincey and Jones concluded that the use of a deadly weapon disqualifies b(3) assault from being included

A-4638-15T2

under N.J.S.A. 2C:1-8(d)(1) because "[t]his element of a deadly weapon is not an element of the (b)(1) crime."

[Id. at 575-76 (alteration in original) (citation omitted).]

We declined to follow the holding in Jones. As we explained:

The analysis is flawed because N.J.S.A. 2C:1-8(d)(1) requires that the lesser offense be established by proof of the same or less than all the "facts," not "elements," required to establish the commission of the offense charged. "Since [State v.] Davis, [68 N.J. 69 (1975),] we have dealt with merger issues by focusing on the specific facts of each case." State v. Miller, 108 N.J. 112, 117 (1987).

[Id. at 576 (alterations in original) (footnote omitted).]

We instead held that

[w]here the facts of a particular case are such that the State is required to prove that a b(1) assault was committed with a deadly weapon, a b(3) assault is a lesser included offense. Put another way, by its silence as to whether the serious bodily injury required of b(1) assault must be caused by a deadly weapon, the Legislature intended that the crime is committed regardless of whether a deadly weapon is used. Thus where a deadly weapon is used to commit a b(1) assault, (b)(3) assault is a lesser included offense[.]

[Id. at 576-77.]

In light of this holding, we reviewed the facts alleged to support the (b)(1)

aggravated assault charge. We concluded that because it was

18

apparent from the three counts of the indictment that the grand jury found probable cause that defendant had committed a single assault and that he had committed it with a deadly weapon . . . he was fairly warned that he would have to defend himself against the charge of having used a deadly weapon.

[Id. at 577.]

We concluded, therefore, that the (b)(3) aggravated assault was a lesser included offense of the (b)(1) aggravated assault charge.  Ibid.

We agree with the rationale expressed in Graham and follow the holding of the panel in that case.  It is plain that the charges against defendant are based on one assault that resulted in serious bodily injuries to Giles through defendant's use of a deadly weapon.  The facts the State needed to prove the (b)(1) aggravated assault also proved the (b)(2) aggravated assault, as the State proved that the (b)(1) aggravated assault was perpetrated with a deadly weapon. The trial court should have merged the two aggravated assault convictions for sentencing purposes.

C.    Sentencing on Weapon-Possession Counts.

We agree with the parties that the trial court erred when sentencing defendant on the weapon-possession counts.  As noted above, the court made no disposition for fourth-degree unlawful possession of a weapon, of which defendant was convicted.  In addition, the court imposed a consecutive sentence

19

of fifteen months for fourth-degree possession of an imitation firearm, of which defendant was acquitted. These errors appear to have been the result of a renumbering of these counts after the court dismissed the two counts relating to robbery.

We therefore vacate the sentence imposed for fourth-degree possession of an imitation firearm, and remand for sentencing on the fourth-degree possession of weapon count and correction of the judgment of conviction to accurately reflect the weapon-possession counts on which defendant was convicted and acquitted.

D.    Defendant's Allocution at Sentencing.

We are not persuaded by defendant's argument that the trial court abused its discretion by infringing on his right to address the court at sentencing. Defendant's right to allocution at sentencing is established in Rule 3:21-4(b), which provides:

> Sentence shall not be imposed unless the defendant is present or has filed a written waiver of the right to be present. Before imposing sentence the court shall address the defendant personally and ask the defendant if he or she wishes to make a statement in his or her own behalf and to present any information in mitigation of punishment. The defendant may answer personally or by his or her attorney.

A defendant has a right to present "his plea in mitigation" because even "[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." State v. Zola, 112 N.J. 384, 428 (1988) (quotations omitted). "[W]hen a trial court fails to afford a defendant the opportunity to make an allocution . . . the error is structural and the matter must be remanded for resentencing without regard to whether there has been a showing of prejudice." State v. Jones, 232 N.J. 308, 319 (2018). However, where a defendant is permitted to address the court at sentencing, but argues that the court abused its discretion by not permitting him to make an additional statement, the analysis differs.

The Court's holding in Jones addresses such circumstances. In that case, the defendant appeared for sentencing with his counsel. Id. at 312. After defense counsel addressed the court, the defendant was permitted to speak without interruption. Id. at 312-13. Thereafter, the defendant interrupted the prosecutor's statement by asking, "[c]an I say something?" Id. at 313. The court responded, "[n]o." Ibid. The "[d]efendant did not speak again nor did he or his counsel ask to speak again." Id. at 314. In a petition for post-conviction relief, the defendant argued that the trial court abused its discretion by not allowing him to respond to the prosecutor's comment. Id. at 315-16.

21

The Court reviewed the trial court's control of the sentencing proceeding with deference. "The trial court is tasked with the important responsibility of maintaining the dignity and fairness of a sentencing proceeding while balancing the interests of all who are affected by the sentencing of a defendant." Id. at 318. Thus, "[a]n appellate court's review of a sentencing court's imposition of sentence is guided by an abuse of discretion standard." Ibid.

The Court held that where a defendant seeks the opportunity for "more time to speak" after completing his or her allocution at sentencing, the trial court should consider: "(1) did the defendant speak already; (2) was the defendant interrupting and abusive; and (3) does the defendant have something to say that is responsive to . . . new substantive material" raised after the defendant completed his or her allocution. Id. at 323-24. Where a defendant believes that the State raised new information after he completed his allocution to which he wishes to respond, the defendant must "raise the issue before the trial court after the prosecutor finishe[s] speaking or in the form of a post-sentencing application." Id. at 320-21. In addition, a defendant should "offer[] a sworn statement – or any statement for that matter – indicating what he claims he would have said after the prosecutor spoke." Id. at 321. As the Court explained, "[a] trial judge is not expected to be clairvoyant. When neither defendant nor his

counsel made any request to be heard after the prosecutor concluded her remarks, the court reasonably proceeded with the sentencing." Ibid. It was not an abuse of discretion for the court to "not mak[e] inquiry of [defendant] . . . in the face of the silence from defendant and his counsel." Ibid.

Here, the court held two sentencing hearings. Defendant was permitted to address the court at the first hearing. After he completed his allocution, and after the prosecutor's statement, defendant interrupted the court as it was making findings regarding mitigating factors. The defendant appeared to be arguing that he committed the assault at "gunpoint." The trial court responded as follows:

> Sir, the Court is speaking. Your attorney will address whatever concerns that you have, but please do not interrupt the Court as I'm speaking. I've given you the opportunity to speak already, sir. Please let the Court continue with her sentencing.

The defendant again tried to interrupt the court to state that he had "indicated on record" that he committed the assault at gunpoint. The court continued with its findings, addressing the point defendant sought to raise, and offering defense counsel the opportunity to make a further statement:

> There is nothing before this Court. And the only thing I can draw an inference is that Mr. Johnson would like the Court to believe that he acted under duress, that he was forced into beating the victim because someone threatened him with a gun. That's the only thing I can think of. I note that there was no duress argument

23

presented to this jury. I'm satisfied with the colloquy that I conducted of Mr. Johnson in reference to if, in fact, he wanted to take the stand and put forth any type of a defense. Mr. Johnson waived his right. I made my record as to my finding that he knowingly and voluntarily waived his right. Now, [defense counsel], do you wish to expound upon what your client is trying to state on the record regarding gunpoint when he says that?

[DEFENSE COUNSEL]: No, I don't.

THE COURT: Okay. So you're not raising that there was any issue of duress?

[DEFENSE COUNSEL]: I'm not raising that issue.

THE COURT: Okay. I've given counsel the opportunity if she wanted to raise that issue before the Court that there were facts that led to a reason why Mr. Johnson acted the way he did. Again, I note that there was nothing during trial that was brought to the Court's attention and certainly I didn't hear a duress defense being filed in this matter.

At the second hearing, the court again invited defense counsel to address mitigating factors. Counsel declined the invitation. Defendant did not ask to address the court.

Our review of the record reveals no abuse of discretion by the trial court. Defendant made a statement to the court at the first sentencing hearing. Although his attempts to interrupt the court as it was making findings to address his claim of duress were rebuffed, the court thereafter offered his counsel the

opportunity to make a further statement regarding duress. Defense counsel declined that invitation. The court subsequently held a second sentencing hearing. Defense counsel, who sent the court a letter between the two sentencing hearings acknowledging defendant's waiver of the duress defense, again declined the opportunity to make a further statement to the court. Defendant did not ask to speak at the second sentencing hearing. Moreover, it is clear from the record that the court considered and rejected as unproven defendant's claim that he committed the assault on Giles because he was under duress.

Defendant's convictions are affirmed. The sentence imposed for fourth-degree possession of an imitation firearm is vacated. The matter is remanded for correction of the judgment of conviction and resentencing in conformity with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION